## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IMPOSSIBLE FOODS INC., | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Civil Action No. 22-311-WCB |
| | § | |
| MOTIF FOODWORKS, INC., | § | **FILED UNDER SEAL** |
| | § | |
| *Defendant*. | § | |
| | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

In this patent case, plaintiff Impossible Foods Inc. ("Impossible") has alleged that several food products sold by defendant Motif Foodworks, Inc., ("Motif") infringe the claims of various patents owned by Impossible. Both before and during this litigation, Impossible retained private investigation firms in an effort to obtain samples of Motif's products. Motif alleges that Impossible's use of private investigators, and in particular the conduct of the investigators as agents of Impossible's attorneys, violated the applicable Rules of Professional Conduct. Based on those allegations, Motif seeks a protective order together with discovery into the actions taken by the investigators.[1]

### I.    <u>Background</u>

Impossible and Motif are competitors that produce and sell plant-based food products designed to mimic the taste of meat. Motif has repeatedly stated in public that its products may be

---

[1] District of Delaware Local Rule 83.6(d) provides that all attorneys admitted or authorized to practice before the United States District Court for the District of Delaware shall be governed by the American Bar Association's Model Rules of Professional Conduct. The provisions in the ABA's Model Rules that are applicable to this case are identical to the corresponding provisions of the Delaware Rules of Professional Conduct.

sampled at trade shows and may be purchased on a business-to-business ("B2B") basis.  Dkt. No. 77 ¶¶ 2–4.[2]  In response to those announcements, Impossible, through its counsel at Wilson Sonsini Goodrich & Rosati ("WSGR"), hired two private investigation firms to obtain samples of Motif products from trade shows and through Motif's B2B sales channels.  *Id.* ¶ 5.

In December 2021, WSGR engaged a private investigation firm, T&M USA, LLC, to investigate Motif's products and the possible infringement of Impossible's patents.  *Id.*  Later that month, T&M employee Bill Weller attended the Plant Based World Expo in New York City and interacted with Motif representatives manning the Motif booth at that trade show, including one who said that Motif's hamburger patties would not be in production until October 2022.  Dkt. No. 73 ¶ 5; Dkt. No. 74 ¶ 5; Dkt. No. 73-1.  Mr. Weller allegedly represented himself as affiliated with the Centerport Yacht Club.  Dkt. No. 74 ¶ 5.

In follow-up correspondence after the trade show, a Motif representative reached out to Mr. Weller by email to gauge his interest in Motif's products.  Dkt. No. 73 ¶ 6.  Mr. Weller responded by email, asking if Motif's hamburger patty would be in production by October.  Dkt. No. 73-1.  Mr. Weller added that a friend of his was an agent for a restaurant group in Manhattan that is interested in Motif's product.  *Id.*  Motif responded that they were "still working towards availability around Sept-Oct."  *Id.*  Motif proposed a meeting with Mr. Weller, but after a brief response, Mr. Weller had no further contact with Motif at that time.  *Id.*

In February 2022, WSGR engaged another private investigation firm, Paramount Investigative Services, and requested that Paramount have an investigator attend the "Future Food-Tech San Francisco" trade show held on March 24 and 25, 2022.  Dkt. No. 77 ¶¶ 10–11; *see also*

---

[2]   The facts recited in this opinion, which are largely undisputed, are taken from declarations submitted by the parties.

Dkt. No. 76-1, Exh. 1.  At the trade show, Paramount's investigator "obtained samples of Motif's plant-based product, which was offered by Motif at its booth and available to all attendees" of the event.  Dkt. No. 77 ¶ 11.  The investigator also asked if he could "meet with the [trade show's] third-party caterer so that he could obtain access to their kitchen in order to inspect Motif's products and their preparation"; that request was denied.  Dkt. No. 75 ¶ 8.  WSGR represents that it "has not used and will not use the samples" acquired by Paramount's investigator.  Dkt. No. 77 ¶ 11.  After the March 2022 trade show, Paramount terminated its investigation into Motif.  *Id.* ¶ 12.

T&M subsequently created a limited liability company, Food4Thought, LLC, so as to "enable T&M investigators to engage with Motif as a potential B2B customer."  *Id.* ¶ 14; *see also* Dkt. No. 76-1, Exh. 2.  As part of those efforts, T&M used employees of another company, Integrity One Solutions LLC.[3]  Dkt. No. 77 ¶ 13.  T&M's investigators attended several trade shows, including NOSH Live, held in New York City on June 13 and 14, 2022; and the Plant Based World Conference & Expo, held in New York City on September 8 and 9, 2022.  *Id.* ¶¶ 15–16.  At the NOSH Live trade show, T&M investigators listened to industry speakers and had a short conversation with a Motif employee.  *Id.* ¶ 15.  At the Plant Based World Conference trade show, T&M's investigators, posing as employees of Food4Thought, spoke with Motif employees and obtained "samples of Motif's cooked and raw product," which were available to all attendees.  *Id.*

Julia Dacri, who holds the title of "Communications Manager" at Motif, stated in a declaration that she operated Motif's booth at the Plant Based World Conference & Expo and served cooked samples of Motif's "burgers, chicken cutlets, cheese, and burger grounds."  Dkt.

---

[3] For purposes of this opinion, T&M and Integrity One are treated collectively as "T&M."

No. 75 ¶¶ 1, 13–14.  While Ms. Dacri was operating the booth, she was approached by two persons who claimed to be affiliated with Food4Thought and who identified themselves as Sarah Jamil and Ed Barry.  *Id.* ¶ 15.  Ms. Jamil and Mr. Barry asked Ms. Dacri if they "could obtain a raw sample of Motif's food products," because they "wanted to touch and feel the raw Motif products." *Id.* ¶ 16.  Ms. Jamil and Mr. Barry explained that they wanted those samples because Food4Thought was considering "a collaboration with Motif for [Food4Thought's] meal kit service." *Id*  Ms. Dacri stated that Ms. Jamil and Mr. Barry asked how Motif's products were made and what ingredients they contained, but she responded that information about the ingredients was proprietary to Motif.  *Id.* ¶18.

Approximately two months after the September trade show, Ms. Jamil contacted Motif by email, asking to "discuss [Motif's] product distribution for inclusion in our meal product."  Dkt. No. 74-1, Exh. A.  Nilofer Ahmed, who holds the title of Vice President of Sales at Motif, responded to that email and directed Ms. Jamil to communicate with Joanne Kennedy, the Director of Business Development at Motif.  *Id.*; Dkt. No. 74 ¶¶ 1–2, 6.  Ms. Kennedy subsequently arranged a Zoom meeting between Ms. Kennedy, Ms. Jamil, and Bill Weller, who was also purporting to be an employee of Food4Thought.  Dkt. No. 74 ¶ 7; Dkt. No. 74-1, Exh. A.  That meeting took place on December 6, 2022.  Dkt. No. 74 ¶ 7.

During the Zoom meeting, Ms. Jamil and Mr. Weller did not appear by video, but instead used the "audio only" feature of Zoom.  *Id.* ¶ 8.  Ms. Jamil and Mr. Weller provided numerous details about Food4Thought and the company's purported plans to launch a meal kit service.  *Id.* ¶¶ 13–16.  At the end of the meeting, Ms. Jamil and Mr. Weller requested that raw samples of Motif food products be sent to Food4Thought's New York location, but they did not provide a shipping address.  *Id.* ¶ 17.

In the course of the Zoom meeting, Ms. Kennedy noticed that Ms. Jamil's Zoom interface initially read "Sarah Nasir," but later in the meeting was changed to "Sarah Jamil." *Id.* ¶¶ 9–10. Upon investigation after the meeting, Ms. Kennedy determined that "Sarah Jamil" was actually a person named Sarah Nasir and that she was employed by Integrity One Solutions. *Id.* ¶ 18. Integrity One describes itself on its LinkedIn page as "an investigative and risk advisory firm that specializes in internal and financial forensic investigations." LinkedIn, *Integrity One Solutions, LLC,* https://www.linkedin.com/company/integrity-1-solutions-llc (last visited May 25, 2023). Ms. Kennedy also determined that the Food4Thought website was very rudimentary and did not mention either Mr. Nasir or Mr. Weller. Dkt. No. 74 ¶ 19. She concluded that Mr. Weller "was posing as a legitimate potential customer of Motif's products in an attempt to encourage [her] to provide him with information and samples of Motif's products." *Id.* ¶ 14.

In December 2022 and January 2023, Ms. Nasir sent a total of three follow-up emails to Ms. Kennedy, asking about what the "next step" would be in enrolling in Motif's "sampling program." Dkt. No. 74-1, Exh. C. Ms. Kennedy does not appear to have responded to any of those inquiries. *See id.*

In early 2023, Motif announced a "direct-to-consumer sampling program." Dkt. No. 74 ¶ 23. In response to that announcement, Ms. Nasir sent three more emails to Ms. Kennedy and Ms. Ahmed, again requesting samples of Motif's products. *Id.* ¶¶ 24, 26; Dkt. No. 74-1, Exhs. D–F. Mr. Weller also called Ms. Kennedy and asked for information about the direct-to-consumer sampling program. Dkt. No. 74 ¶¶ 25. Ms. Kennedy did not respond to those requests. *See id.*; Dkt. No. 74-1, Exhs. D–F. T&M's investigation terminated as of April 18, 2023. Dkt. No. 77 ¶ 21.

On May 12, 2023, Motif sought relief from the court based on the conduct of the investigators. In particular, Motif seeks a protective order barring Impossible, its counsel, and its agents from undertaking "any further undisclosed investigations of Motif or its employees outside of the normal discovery process of this litigation or through the use of false pretenses, private investigators, or other unlawful, fraudulent, or unethical means" and from using any of the information or product samples obtained by those investigative firms, "including by presenting arguments or seeking discovery concerning the same." Dkt. No. 72, Exh. 6 ¶¶ 1–2. Motif also requests that the court order Impossible and its counsel to produce documents and communications exchanged with the investigative firms regarding efforts to contact Motif or its employees and the results of the firms' investigations, as well as communications between Impossible and its counsel regarding efforts to contact Motif "outside of this litigation." *Id.* ¶ 3. Finally, Motif requests that the court order Impossible and/or its counsel to produce a declaration "describing all outreach by Impossible and Impossible's agents (including its counsel) relating to efforts to contact Motif or Motif's employees outside of the formal discovery process in this litigation," and any further appropriate discovery or sanctions. *Id.* ¶¶ 4–5.

At the court's direction, the parties filed letter briefs outlining their positions with respect to the dispute. Dkt. Nos. 72, 76, 78. During a telephonic hearing on May 22, 2023, I requested that WSGR provide the court with any communications sent from the investigators to WSGR for *in camera* review. I received those documents on May 26, 2023, and have reviewed them.

## II.    <u>Discussion</u>

Motif contends that the actions of Impossible's attorneys in directing the private investigators to contact Motif's employees to obtain information relating to this case violated the ABA and Delaware Rules of Professional Conduct. In particular, Motif contends that Impossible

violated four of those rules through its use of private investigators to contact and elicit information from employees of a party known to be represented by counsel in pending litigation:  Rule 4.1, Rule 4.2, Rule 5.3, and Rule 8.4.

At the outset, I note that the Rules do not specifically address the use of pretextual investigations to contact employees of represented organizations.  Although state courts and bar associations have grappled with that question, *see Suggs v. Capital Cities/ABC, Inc.*, No. 86-2774, 1990 WL 182314, at *3 (S.D.N.Y. Apr. 24, 1990) (collecting state court decisions and bar association opinions),[4] there is only limited federal judicial authority addressing the subject.  The judicial authority that does exist tends to be heavily fact-dependent; courts have not set forth a bright-line rule indicating precisely when such pretextual investigations are permissible and when they are not.  Nonetheless, the guiding principles from those authorities are informative, and I address them in detail below.

### A.   Rules 5.3 and 8.4

Rule 5.3(c) of the Model Rules provides that, with respect to a nonlawyer who is employed or retained by a lawyer, the lawyer "shall be responsible for the conduct of such a person that would be a violation of the Rules of Professional Conduct if engaged in by a lawyer" if "the lawyer orders or, with the knowledge of the specific conduct, ratifies the conduct involved."  Model Rules

---

[4]  The *Suggs* case and the great majority of the authorities cited by the court in that case hold that pretext-based contacts by investigators with employees of represented organizations are permissible under appropriate circumstances.  Bar association opinions in the years after *Suggs* are to the same effect.  *See, e.g.,* Colo. Bar Ass'n Op. 137 (May 18, 2019); N.C. Bar Ass'n Op. 2014-9 (July 17, 2015); Ore. Bar Ass'n Op. 2005-173 (Aug. 2005); Ariz. Bar Ass'n Op. 99-11 (Sept. 1999).  In an ethics opinion issued in 2001, the ABA declined to address the application of the Model Rules "to deceitful, but lawful conduct by lawyers, either directly or through supervision of the activities of agents and investigators."  Am. Bar Ass'n & The Bureau of Nat'l Affs., Inc., Lawyers' Manual on Professional Conduct, Ethics Opinions 2001–2005, Formal Ethics Opinion 01-422 (June 24, 2001), at 1201:101.

of Professional Conduct Rule 5.3(c) (Am. Bar Ass'n 2023); *see In re Complaint of PMD Enterprises Inc.*, 215 F. Supp. 2d 519, 529 (D.N.J. 2002).   Relatedly, Rule 8.4(a) provides that it is professional misconduct for a lawyer to "knowingly assist or induce another" to violate the Rules of Professional Conduct, or to "do so through the acts of another."   Model Rules of Professional Conduct Rule 8.4(a).   As applied to this case, those two rules make it clear that if the conduct of the investigators would amount to a violation of the Rules of Professional Conduct if engaged in by an attorney, the attorneys at WSGR who directed that conduct would also be deemed to have violated those rules.

### B.   Rule 4.1

Rule 4.1(a) of the Model Rules prohibits a lawyer from, "[i]n the course of representing a client," making "a false statement of material fact or law to a third person."  *Id.* Rule 4.1(a).   In this case, the T&M investigators indisputably made false statements to Motif's employees about their identities and the business plan of Food4Thought.   Put simply, a Rule 4.1 violation lies if false statements such as those, made in the context of investigating potential misconduct by another party, are prohibited by the Rules of Professional Conduct.   The separate question whether the fact that the false statements were made to employees of a represented organization amounts to a violation of the Rules of Professional Conduct is addressed in the section regarding Rule 4.2 below.

The weight of authority indicates that misrepresentations made solely as to identity or purpose do not rise to a violation of Rule 4.1 when the investigator is posing as a customer in the ordinary course of business.   David B. Isbell, a former chair of the American Bar Association Standing Committee on Ethics and Professional Responsibility, co-authored a leading law review article on this subject, which summarized the state of the law at that time.   The article stated that "the *Model Rules*, properly read, do not prohibit a lawyer's using investigators or testers who make

misrepresentations about their identity or purpose."   David B. Isbell & Lucantonio N. Salvi,
*Ethical Responsibility of Lawyers for Deception by Undercover Investigators and Discrimination
Testers: An Analysis of the Provisions Prohibiting Misrepresentation Under the Model Rules of
Professional Conduct*, 8 Geo. J. Legal Ethics 791, 811 (1995) (capitalization altered).  With respect
to Rule 4.1, the article explained that such statements are not made "in the course of representing
a client," as provided by Rule 4.1, and that the rule is intended to require "a standard of candor
and fairness that does not necessarily apply in the ordinary exchanges among persons who do not
purport to own any professional credentials."  *Id.* at 814–15.

To the same effect is the statement of Professor Bruce A. Green, former co-chair of the
ABA Litigation Section's Committee on Ethics and Professionalism, which was summarized by
the court in *Apple Corps Limited v. International Collectors Society*, 15 F. Supp. 2d 456, 475
(D.N.J. 1998), as follows:  "The prevailing understanding in the legal profession is that a public
or private lawyer's use of an undercover investigator to detect ongoing violations of the law is not
ethically proscribed, especially where it would be difficult to discover the violation by other
means."

More generally, courts have held that attorneys may use investigators who pose as
consumers in various contexts.  *See, e.g.*, *Cartier v. Symbolix, Inc.*, 386 F. Supp. 2d 354, 362
(S.D.N.Y. 2005) ("The prevailing understanding in the legal profession is that a public or private
lawyer's use of an undercover investigator to detect ongoing violations of the law is not ethically
proscribed, especially when it would be difficult to discover the violations by other means."
(cleaned up)); *Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 82 F. Supp. 2d 119, 122 (S.D.N.Y.
1999) ("[H]iring investigators to pose as consumers is an accepted investigative technique, not a
misrepresentation."); *Apple Corps*, 15 F. Supp. 2d at 475 (the New Jersey Rule of Professional

9

Conduct that prohibits misrepresentations "does not apply to misrepresentations solely as to identity or purpose and solely for evidence-gathering purposes.").

Other courts have agreed that an undercover investigator's failure to disclose his true identity generally does not constitute fraudulent, unethical, or otherwise impermissible conduct, particularly when the investigation is directed at detecting violations of law, such as infringement of intellectual property rights, and the investigation consists of engaging in commonplace consumer-business interactions. *See, e.g., Alzheimer's Found. Of Am., Inc. v. Alzheimer's Disease & Related Disorders Ass'n*, 796 F. Supp. 2d 458, 472 (S.D.N.Y. 2011) ("The investigation does not in itself constitute fraud."); *Sega Enterprises Ltd. v. MAPHIA*, 857 F. Supp. 679, 689 (N.D. Cal. 1994) ("[T]he fact that a plaintiff's employee, in the course of investigating a copyright or trademark infringement, fails to identify herself as such to the defendant does not provide a defense to the infringement when such identification would have defeated the investigation."); *Olan Mills, Inc. v. Linn Photo Co.*, 795 F. Supp. 1423, 1430 (N.D. Iowa 1991), *rev'd on other grounds*, 23 F.3d 1345 (8th Cir. 1994) ("While the failure to disclose the relationship between [the plaintiffs] and [the investigator] was, in a sense, deceptive, it is not the kind or degree of deception which gives rise to a defense of unclean hands."); *Reebok Int'l Ltd. v. Jemmett,* No. 87-1415, 1988 WL 106933, at *4 (S.D. Cal. Feb. 5, 1988) ("The fact that [the investigator], who was employed by [the plaintiff], may not have identified himself as an employee of plaintiff, and led defendant to believe that he was someone other than an investigator for [the plaintiff], is not sufficient reason to keep plaintiff's counsel from access to information regarding defendant's activities."); *Chloé v. Designersimports.com USA, Inc.*, No. 07-1791, 2009 WL 1227927, at *10 (S.D.N.Y. April 30, 2009) ("[I]t is difficult to imagine that any trademark infringement investigator would announce her true identity and purpose when dealing with a suspected seller of counterfeit goods."); *A.V. by*

*Versace, Inc. v. Gianni Versace, S.p.A.*, No. 96-9721, 2002 WL 2012618, at *4 (S.D.N.Y. Sept. 3, 2002) (rejecting complaint regarding the use of a private investigator using a false name, noting that "[t]he investigator's actions conformed with those of a business person in the fashion industry").

Ethics committees in various states have addressed the issue as well, with divergent results, again often depending on the particular facts of the cases before them.  A 2007 opinion from the New York County Lawyers' Association Committee on Professional Ethics is generally representative.   The Committee in that case declined to rule that pretextual investigations sponsored by an attorney are invariably unethical.  *See* NYCLA Committee on Professional Ethics, Formal Opinion No. 737 (May 23, 2007), https://www.nycla.org/resource/ethics-opinion/nycla-committee-on-professional-ethics-formal-opinion-on-non-government/.   Instead, that opinion explained that "dissemblance," i.e., "misstatements as to identity and purpose made solely for gathering evidence," is "ethically permissible in a small number of exceptional circumstances." *Id.*  Specifically, the Committee explained that a lawyer supervising investigators who dissemble acts unethically unless:

> (i)      either (a) the investigation is of a violation of civil rights or intellectual property rights and the lawyer believes in good faith that such violation is taking place or will take place imminently or (b) the dissemblance is expressly authorized by law; and
>
> (ii)     the evidence sought is not reasonably and readily available through other lawful means; and
>
> (iii)    the lawyer's conduct and the investigator's conduct . . . do not otherwise violate the [Rules of Professional Ethics]; and
>
> (iv)    the dissemblance does not unlawfully or unethically violate the rights of third parties.

*Id.*

The bar associations of at least two states have adopted provisions expressly recognizing that the use of covert activity in investigations of violations of law is not unethical.  *See* Oregon

Rules of Professional Conduct § 8.4(b) ("[I]t shall not be professional misconduct for a lawyer to advise clients or others about or to supervise lawful covert activity in the investigation of violations of civil or criminal law or constitutional rights, provided the lawyer's conduct is otherwise in compliance with these Rules of Professional Conduct. 'Covert activity,' as used in this rule, means an effort to obtain information on unlawful activity through the use of misrepresentations or other subterfuge."); Wis. Sup. Ct. R. 20:4.1(b) ("Notwithstanding par. (a), SCR 20:5.3(c)(1), and SCR 20:8.4, a lawyer may advise or supervise others with respect to lawful investigative activities.").

In support of its contention that the misrepresentations attributable to Impossible's attorneys violated Rule 4.1, Motif relies heavily on a 2016 district court case, *Meyer v. Kalanick*, 212 F. Supp. 3d 437 (S.D.N.Y. 2016). In that case, the defendant in a civil action hired an investigator to conduct "secret personal background investigations" of the plaintiff and his counsel. The investigator contacted 28 "acquaintances or professional colleagues" of the plaintiff and his counsel, and in approaching those individuals, made "materially false statements about why he was contacting them." *Id.* at 440. The court held that the investigator's conduct, authorized by the defendant's attorney, violated the Rules of Professional Conduct because the investigator made false statements of material fact and "contravene[d] the truth-seeking function" of litigation by "mak[ing] fraudulent representations in order to surreptitiously gain information about litigation adversaries through intrusive inquiries of their personal acquaintances and business associates." *Id.* at 446. The court distinguished the *Gidatex* and *Apple Corps* cases (discussed in further detail below), noting that unlike in those cases, the defendant in *Meyer* was not "seeking to investigate misconduct that the plaintiff had perpetrated vis-à-vis [the defendant]" nor was it seeking to "discover whether plaintiff and his counsel were disobeying an existing court order." *Id.* Notably,

12

in this case Impossible was seeking to investigate unlawful conduct that Motif may have engaged in—specifically, patent infringement.

The false statements at issue in this case are quite different from those at issue in *Meyer*. Impossible was not using investigators to obtain highly sensitive information that would not otherwise have been revealed to any outsider; the evidence the investigators obtained was the type of information and material that ordinarily would be made available to legitimate customers. The information sought by Impossible, moreover, was directly relevant to the alleged unlawful conduct at issue in the case. Unlike in *Meyer*, the investigators were not seeking to obtain adverse information about litigation adversaries unrelated to the unlawful activities alleged in the complaint.

Overall, in view of the analysis in the Isbell and Salvi article and the cases cited above, I find that Impossible's use of investigators to pose as potential B2B customers of Motif in order to obtain a product sample that would ordinarily be made available to such customers is not the sort of conduct that Rule 4.1 is intended to proscribe. To be sure, one factor that bears on the legitimacy of the investigative measures taken in this case is whether the information sought could have been obtained by other lawful means, such as discovery. Because such information is properly discoverable in litigation, that factor cuts somewhat against Impossible's claim that a pretextual investigation was necessary in this case.[5] On the other hand, much of the information that was obtained as a result of the investigation could have been gathered by anyone attending the various trade shows between 2021 and 2023, such as samples of Motif's hamburger patties, which were

---

[5] A mitigating factor on this score is that given the nature of the materials the investigators were attempting to obtain—perishable food products—it may be the case that the particular products being prepared and offered at the trade shows would not have been preserved and available for later production during discovery proceedings.

apparently being freely passed out to attendees at the trade shows.  It is therefore clear that Motif

did not regard the products it was offering for sale as themselves confidential.

Taking all the circumstances into account, I find that there has been no violation of Rule

4.1 by the Impossible attorneys based on the work of the investigators.

###    C.    Rule 4.2

Even if the false statements made by the investigators are not the sort of false statements

that are prohibited by Rule 4.1, a separate question is whether Impossible's attorneys violated Rule

4.2 by arranging for the investigators to seek information from a represented party.  Model Rule

4.2 prohibits communications with persons represented by counsel under certain circumstances.

Specifically, that rule recites:

> In representing a client, a lawyer shall not communicate about the subject of the
> representation with a person the lawyer knows to be represented by another lawyer
> in the matter, unless the lawyer has the consent of the other lawyer or is authorized
> to do so by law or a court order.

Model Rules of Professional Conduct Rule 4.2.  In a comment, the Model Rules explain that in the

case of a represented organization Rule 4.2 prohibits

> communications with a constituent of the organization who supervises, directs or
> regularly consults with the organization's lawyer concerning the matter or has
> authority to obligate the organization with respect to the matter or whose act or
> omission in connection with the matter may be imputed to the organization for
> purposes of civil or criminal liability.

*Id.* Rule 4.2 cmt. 7.[6]

---

[6]  Comment 7 to Rule 4.2 (previously comment 4) was amended in 2002 to narrow the
scope of the rule as applied to organizations.  The prior version of the comment prohibited
communication with a represented person having managerial responsibility, the ability to make
admissions on the organization's behalf, or the authority to obligate the organization with respect
to the matter.  *See* Am. Bar Ass'n, A Legislative History: The Development of the ABA Model
Rules of Professional Conduct, 1982–2005, 542 (2006).  Cases decided prior to 2002 typically rely
on the pre-2002 version of the comment.

Motif argues that Impossible's attorneys were responsible for the investigators' communications with Motif's employees, and that they violated Rule 4.2 because they knew that Motif was represented by counsel.  Impossible disagrees, arguing that the use of investigators posing as customers in the ordinary course of business does not rise to a violation of Rule 4.2.

Comment 7 to Rule 4.2 delineates two categories of employees who may not be contacted: (1) members of the litigation control group; and (2) persons who have "authority to obligate the organization with respect to the matter" or "whose act or omission in connection with the matter may be imputed to the organization for purposes of civil or criminal liability."  *Id.*  There is no contention that any Motif employees contacted by the investigators fall into the first category, but Motif argues that its employees fall into the second category.

There is little in the record regarding Motif's organizational structure, and it is unclear whether any of the Motif employees with whom the investigators interacted were persons whose acts or omissions could theoretically be imputed to Motif.  Functionally, however, the evidence suggests that in the course of their interactions with the investigators, the Motif employees were performing ministerial acts such as manning the company's booths at trade shows and responding to inquiries from potential customers.  Moreover, it does not appear that any of the interactions between the investigators and Motif personnel resulted in any statements or actions that could be imputed to Motif.  Therefore, although several of the Motif employees who interacted with the investigators had titles such as Communications Manager and Director of Business Development, the record does not suggest that their interactions with the investigators were directed to, or resulted in, any relevant statements or actions that would be attributable to Motif.

The parties have cited several cases in support of their respective positions regarding the applicability of Rule 4.2 to the conduct at issue in this case. Those cases, and several others, are worthy of close consideration.

In *Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, the plaintiff hired two private investigators to pose as interior designers and visit the defendants' furniture showrooms. 82 F. Supp. 2d at 120. One investigator visited a showroom on three occasions and recorded her conversations with the defendants' salesclerks on each occasion. *Id.* at 120–21. The investigator asked questions about furniture products sold under a trademark owned by the plaintiffs. *Id.* The court held that the investigator's conduct did not implicate the New York equivalent of Rule 4.2, because "the investigators did nothing more than observe and record the manner in which [the defendants'] employees conducted routine business." *Id.* at 122. The court also held that even if the rule was implicated, there was no violation because "[t]he use of private investigators, posing as consumers and speaking to nominal parties who are not involved in any aspect of the litigation, does not constitute an end-run around the attorney/client privilege." *Id.* at 126. In particular, the court focused on the fact that the plaintiffs' investigators "did not interview the sales clerks or trick them into making statements they otherwise would not have made," but instead "merely recorded the normal business routine in the [defendants'] showroom and warehouse." *Id.*

In *Apple Corps*, the parties had previously agreed to a consent order that permitted the defendants to sell a limited number of stamps bearing the likeness of John Lennon to members of the "Beatles/Lennon Club." 15 F. Supp. 2d at 460. Suspecting that the defendants were selling stamps to non-members in violation of the consent order, the plaintiffs hired a private investigation firm to call the defendants and attempt to purchase the stamps without being members. *Id.* at 462. The defendants moved for sanctions, arguing in part that the plaintiffs' investigators' calls to the

16

defendants violated New Jersey Rule of Professional Conduct 4.2, which prohibits a lawyer from contacting a represented party. *Id.* at 472.  The court found no violation of the rule, because the callers "posed as normal consumers" and made misrepresentations only "as to the callers' purpose in calling and their identities." *Id.* at 474.  The court added that Rule 4.2 "cannot apply where lawyers and/or their investigators, seeking to learn about current corporate misconduct, act as members of the general public to engage in ordinary business transactions with low-level employees of a represented corporation." *Id.* at 474–75.

Other courts have followed the district court decisions in *Gidatex* and *Apple Corps*.  In *Manufacturing Automation & Software Systems, Inc. v. Hughes,* No. 16-8962, 2017 WL 11630961 (N.D. Ill. Dec. 1, 2017), the court found *Gidatex* to be "persuasive authority" for the proposition that "ethical rules should not govern situations where a party is legitimately investigating potential unfair business practices by use of an undercover posing as a member of the general public engaging in ordinary business transactions with the target." *Id.* at *10–11 (citation omitted).  Similarly, in *Hill v. Shell Oil Co.*, 209 F. Supp. 2d 876 (N.D. Ill. 2002), the court cited *Gidatex* and *Apple Corps* with approval and noted that while lawyers and investigators "cannot trick protected employees into doing things and saying things they otherwise would not do or say," they "probably can employ persons to play the role of customers seeking services on the same basis as the general public." *Id.* at 879.

In *Midwest Motor Sports v. Arctic Cat Sales, Inc.*, 347 F.3d 693, 695 (8th Cir. 2003), a case relied on by Motif, the court reached a different result on quite different facts.  In that case, a snowmobile manufacturer hired a private investigator to visit two dealerships of the manufacturer's franchisees, each of which were represented parties in the lawsuit.  With respect to the first dealer, the investigator visited the dealer's showroom and recorded conversations with

17

a salesperson about the manufacturer's line of snowmobiles.  *Id.* at 695–96.  The court held that

contact to be impermissible under Rule 4.2 because the discussions with the salesman "were

intended to elicit admissions to be used against [the dealer] at trial."  *Id.* at 698.

With respect to the second dealer, the private investigator and his wife posed as customers

at the dealer's showroom and questioned the dealer's president and owner about the

manufacturer's products.  The court held that the communication was improper because the

president was a "'critical' nonparty witness with ultimate managerial responsibility for [the

dealer]."  *Id.* at 697.  That is, the president was a member of the corporate control group, the

members of which were not allowed to be contacted in the absence of counsel under the version

of Rule 4.2 that was then in effect in South Dakota.  *See Midwest Motor Sports, Inc. v. Arctic Cat*

*Sales, Inc.*, 144 F. Supp. 2d 1147, 1154–58 (D.S.D. 2001), *aff'd*, 347 F.3d 693 (8th Cir. 2003).

In *Site 2020 Inc. v. Superior Traffic Services, LLC*, another case relied on by Motif, an

employee of the plaintiff used a fake name and posed as an employee of a third-party company

that, unbeknownst to the defendant, had recently been acquired by the plaintiff.  No. 9:21-cv-63,

Dkt. No. 132, at 5–7 (D. Mont. Mar. 27, 2023).  The plaintiff's employee participated in a product

demonstration with the defendant's Chief Executive Officer and a sales representative of the

defendant, and the demonstration, which was recorded, lasted more than an hour.  *Id.* at 9.  During

the demonstration, the defendant's representatives provided "extensive narrative answers"

regarding several topics that were relevant to the plaintiff's patent infringement claims.  *Id.* at

9–10.  The meeting then moved to a conference room, where the defendants' representatives

provided "narrative answers divulging business information" such as marketing and regulatory

strategies.  *Id.* at 10–11.  Under those circumstances, the court held that the plaintiff engaged in

misconduct by "essentially obtain[ing] a lengthy, undisclosed, ex parte recorded interview with

18

the president of its party-opponent on matters relating to the merits of the claims and counterclaims in this case." *Id.* at 21.

 As noted, the above cases are heavily fact-dependent and do not set forth simple standards as to what conduct is permissible and what conduct is not. On balance, however, I conclude that the actions of the investigators retained by Impossible in relation to this case are more analogous to the actions of the investigators in *Gidatex* and *Apple Corps* than to the actions of the investigators in the cases cited by Motif.

 The only misrepresentations made by the investigators were as to their identities and purpose, and there is no evidence that they "conduct[ed] interviews" or attempted to trick Motif's employees "into making statements they otherwise would not have made." *See Gidatex*, 82 F. Supp. 2d at 126. To be sure, the misrepresentations made by Impossible's investigators were more elaborate than in *Gidatex* and *Apple Corps*: The investigators in this case formed a fictitious company, attended trade shows, and arranged for a meeting with Motif's employees. But the nature of the investigators' conduct was a necessary consequence of Motif's B2B sales model. Because Motif intended to sell its products mainly to other businesses rather than directly to consumers, the investigators had to pretend to be representatives of a business in order to obtain samples of Motif's allegedly infringing products. There is nothing in the record to suggest that the investigators obtained confidential information from the Motif representative or that they sought or obtained treatment any different from the treatment that Motif would have accorded to any interested businesses at the trade shows. At bottom, the investigators continued to act "as members of the general public to engage in ordinary business transactions." *See Apple Corps*, 15 F. Supp. 2d at 474–75.

19

The decisions in *Midwest Motor Sports* and *Site 2020* are not comparable to this case, for three reasons.  First, the investigators in both of those cases communicated with a high-ranking officer of a litigation adversary; the communications in this case were with persons manning booths at trade shows and persons identified by Motif as contact persons for prospective customers.  Second, the communications in the cases relied on by Motif appeared to be made for a different purpose, namely, to gather testimonial evidence to be used against the defendant at trial.  *See Midwest Motor Sports*, 347 F.3d at 698 (discussions with the salesman "were intended to elicit admissions to be used against [the dealer] at trial"); *Site 2020*, Dkt. No. 132, at 21 (describing what the plaintiff obtained as "a lengthy, undisclosed, ex parte recorded interview with the president of its party-opponent on matters relating to the merits" of the case).  In this case, by contrast, Impossible's investigative efforts were not directed at obtaining admissions from Motif's representatives regarding the merits of the case; the investigators' efforts were principally directed at obtaining physical samples of Motif's products.[7]  Third, with respect to *Midwest Motor Sports*, the court appeared to take a negative view of the investigator's choice to make a nonconsensual recording of his conversations with the dealers' representatives.  *See* 347 F.3d at 699–700.  There is no evidence that the investigators retained by Impossible in this case recorded any conversations.

---

[7]  Motif disputes this proposition, arguing that the WSGR's engagement letter with T&M contradicts WSGR's representation "that the sole purpose of the investigations was to obtain samples."  Dkt. No. 78 at 1 (citing Dkt. No. 76-1, Exh. 2, at 1 nn.1–2).  Motif's contention is unpersuasive in view of the engagement letter's stated aim of "obtaining a sample of a certain product that can be tested by [Impossible]."  Dkt. No. 76-1, Exh. 2, at 1.  It is true that the letter provides for investigations "into past and current employees and investors at Counsel's direction," and "recent allegations of fraud, arising from [Motif's] September 2021 trading debut on the NYSE at Counsel's direction."  *Id.* at nn. 1–2.  However, WSGR represents that no such investigations have occurred, and the court's *in camera* review of materials provided by Impossible did not reveal any such investigations.  The investigators' questions of Ms. Dacri as to how Motif's products were made and what ingredients they contained, see Dkt. No. 75 ¶ 18, related to their objective of obtaining samples of the products, and in any event Motif declined to provide that information.

The final case relied on by Motif, *In re Complaint of PMD Enterprises*, 215 F Supp. 2d 519 (D.N.J. 2002), involves extreme conduct not remotely similar to the conduct in this case. The plaintiff's lawyer in that case had his agent contact an employee of the defendant and member of the defendant's litigation control group who was expected to testify as a fact witness in the case. *Id.* at 522–24. The agent offered to pay the employee $100 per hour for two weeks for assisting the plaintiff in the case. *Id.* at 523. The agent also falsely advised the employee that the judge in the case was aware of and had approved of his actions. *Id.* Based on the totality of the agent's conduct, the court sanctioned the attorney by revoking his *pro hac vice* status. *Id.* at 532.[8]

While recognizing that this case presents some difficult line-drawing questions in an area where the lines between the permissible and the prohibited are not definitively spelled out, I find that the investigators' conduct in this case is more like that of the investigators in *Gidatex* and *Apple Corps* than like the conduct in the cases on which Motif relies. In light of the principles set forth by the courts that have addressed the propriety of pretextual investigations in cases such as

---

[8] A case closer to this one, although not cited by Motif, is *Dareltech, LLC v. Xiaomi Inc.*, 18-8729, 2019 WL 10966202 (S.D.N.Y. Apr. 11, 2019). In that case, an attorney accompanied his investigator to a promotional event where the defendant's representatives were displaying their company's products. *Id.* at *1. Without disclosing their identities or purpose, they obtained evidence in the form of statements from the defendant's employees. *Id.* at *1–2. And the district court found that the attorney violated the Rules of Professional Conduct and excluded the evidence in question as a sanction. *Id.* at *3–5. That case is distinguishable from this one in several respects. First, the attorney personally participated in the undercover operation. Second, the attorney and investigator "went beyond general attendance or commercial transactions," and questioned a managerial employee of the defendant, asking "specific, targeted questions related to the scope of [the defendant's] business operations in New York and responsive to proving jurisdiction in this forum." *Id.* at *4. Third, the attorney and investigator recorded the conversations. The *Dareltech* court distinguished the case before it from *Apple Corps*, where the lawyers, through their investigators, sought "to learn about current corporate misconduct, act as members of the general public to engage in ordinary business transactions with low-level employees of a represented corporation." *Id.* (quoting 15 F. Supp. 2d at 474–75).

this one, I find that the conduct of which Motif complains does not constitute a violation of Rule 4.2.

### III.   **Conclusion**

In summary, WSGR has not violated the Rules of Professional Conduct by directing private investigators to obtain samples of Motif's products.  Nor is the court persuaded that Impossible has obtained any unfair benefit as a result of the investigators' activities.  In addition, Impossible has represented that "the relevant investigation ceased prior to [Motif's letter to Impossible objecting to the investigation] and prior to Motif's request for relief, and will not resume."  Dkt. No. 76 at 3.  Accordingly, Motif is not entitled to any sanctions for violations of the Rules of Professional Conduct; there is no justification for a protective order prohibiting any such investigative measures in the future; and there is no need for the court to order additional discovery regarding Impossible's (and its counsel's) interactions with the investigators.  Of course, if Motif believes that the investigators are in possession of information that is relevant to the merits of this case, this order does not preclude Motif from seeking that information in the normal course of fact discovery.

In an abundance of caution, this order has been filed under seal because many of the parties' submissions in connection with the present motions were filed under seal.  Within three business days of the issuance of this order, the parties are directed to advise the court by letter whether they wish any portions of the order to remain under seal, and if so which portions.  Any request that portions of the order should remain under seal must be supported by a particularized showing of need to limit public access to those portions of the order.

IT IS SO ORDERED.

SIGNED this 31st day of May, 2023.

WILLIAM C. BRYSON
UNITED STATES CIRCUIT JUDGE