# EXHIBIT 1

**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017-2543 | TEL (213) 443-3000 FAX (213) 443-3100

WRITER'S DIRECT DIAL NO.
**(213) 443-3257**

WRITER'S EMAIL ADDRESS
**joepaunovich@quinnemanuel.com**

April 25, 2023

<u>VIA E-MAIL</u>

Wendy Devine, Esq.
Wilson Sonsini Goodrich & Rosati
One Market Plaza
Spear Tower, Suite 3300
San Francisco, CA 94105

Re:     *Impossible Foods Inc. v. Motif FoodWorks, Inc.*, C.A. No. 22-311 (WCB)

Counsel:

Over the course of the last few months, Motif has been subjected to repeated and transparent attempts by private investigators, which we are concerned were hired by Impossible or its agents, to obtain information and evidence about Motif's business and products under the guise of being interested third-party customers or business partners.  While ostensibly covert, the fictitious nature of these requests has been woefully blatant.  If done at the behest of Impossible or any of its agents, these efforts are serious violations of the American Bar Association and Delaware Lawyers' Rules of Professional Conduct (together, "RPC"[1]), the Federal Rules of Civil Procedure and the Court's inherent powers to manage this case.

RPC 4.2 prohibits counsel and their agents (*see* RPC 5.3(b)) from "communicat[ing] about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order."  It should go without saying that no such consent or court order has been provided or entered, and Motif would vehemently object to any such effort by Impossible, its counsel or their agents to circumvent the discovery process in this case by engaging in covert investigations.  "In the case of a represented organization, this Rule prohibits communications with a constituent of the organization . . . whose act or omission in connection with the matter may be imputed to the organization for purposes of civil or criminal liability."  Delaware Lawyers' Rules of Professional Conduct at Rule 4.2, comment 7.  Accordingly, communications by counsel or

---

[1]  All RPC Rules referenced herein appear identically in both the American Bar Association and Delaware Lawyers' RPC.

**quinn emanuel urquhart & sullivan, llp**
ATLANTA | AUSTIN | BEIJING | BERLIN | BOSTON | BRUSSELS | CHICAGO | DALLAS | DOHA | HAMBURG | HONG KONG | HOUSTON | LONDON |
LOS ANGELES | MANNHEIM | MIAMI | MUNICH | NEUILLY-LA DEFENSE | NEW YORK | PARIS | PERTH | RIYADH | SALT LAKE CITY |
SAN FRANCISCO | SEATTLE | SHANGHAI | SILICON VALLEY | STUTTGART | SYDNEY | TOKYO | WASHINGTON, DC | ZURICH

April 25, 2023

their agents with Motif's employees in an attempt to obtain information and evidence about Motif's business and products for this litigation would violate RPC 4.2.  *See Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 82 F. Supp. 2d 119, 125 (S.D.N.Y. 1999) (holding that "low-level employees with no management responsibilities whatsoever" were "parties" because plaintiff "is seeking to use the [employees'] statements to impute liability to [defendant]").  Similarly, "engag[ing] in *ex parte* communications . . . using [a] private investigator" is a "violation of RPC 4.2."  *In re Complaint of PMD Enterprises Inc.*, 215 F. Supp. 2d 519, 532 (D.N.J. 2002)[2]; *see also Midwest Motor Sports v. Arctic Sales, Inc.*, 347 F.3d 693, 698 (8th Cir. 2003) "[T]he [ABA] Rules also prohibit contact performed by an investigator acting as counsel's agent.").  In short, attempting to obtain information via covert, fictitious investigators constitutes an improper and unethical attempt to subvert the discovery process.

We take these developments in the case very seriously.  If Impossible, its counsel or any of their agents were in any way involved with retaining, directing, and/or communicating with third parties in efforts to obtain information and evidence about Motif's business and products outside of this litigation, we demand that this conduct immediately cease and desist and request a complete and detailed explanation and production of any and all documents, communications and information relating to these efforts by no later than May 1, 2023.

Sincerely,

Joseph M. Paunovich

cc:     All Counsel of Record

---

[2]  While the *PMD Enterprises* court sanctioned counsel's actions pursuant to New Jersey RPC 4.2, said Rule contains the same prohibition against communications with represented persons as the American Bar Association and Delaware Lawyers' RPC.

# EXHIBIT 2

# WILSON SONSINI

Wilson Sonsini Goodrich & Rosati
Professional Corporation

One Market Plaza
Spear Tower, Suite 3300
San Francisco, California 94105-1126

O: 415.947.2000
F: 866.974.7329

WENDY L. DEVINE
Internet: WDEVINE@wsgr.com
Direct dial: 415.947.2027

May 9, 2023

## Contains Highly Confidential Information

Joseph M. Paunovich
Quinn Emanuel
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543

Re:    Re: Impossible Foods Inc. v. Motif FoodWorks, Inc., C.A. No. 22-311
       (WCB)

Counsel:

I write in response to your letter dated April 25, 2023.  Wilson Sonsini Goodrich and
Rosati ("WSGR") engaged private investigation firm T&M USA LLC ("T&M USA"), which we
have learned then engaged Integrity 1 Solutions, LLC, of which Sarah Nasir is a principal, to
obtain samples of Motif products that Motif either made publicly available at trade shows or that
Motif publicly represented it would make available to interested parties.  Investigators retained
by WSGR, or the agents of those investigators, did no more than ask Motif employees to conduct
the same routine business activities that Motif engaged in with other potential customers.  They
neither sought to induce Motif's employees to engage in infringing conduct nor recorded any
conversations with Motif's employees.

We strongly disagree that the activities of these investigators represent a violation of
either the Delaware Lawyers' Rules of Professional Conduct or the ABA's Model Rules of
Professional Conduct, as case law from courts in the Third Circuit make clear.  *See, e.g.*, *Apple
Corps Ltd. v. Int'l Collectors Soc.*, 15 F. Supp. 2d 456, 474-75 (D.N.J. 1998) ("RPC 4.2 cannot
apply where lawyers and/or their investigators, seeking to learn about current corporate
misconduct, act as members of the general public to engage in ordinary business transactions
with low-level employees of a represented corporation.").  Indeed, as explained by a case that
you cited in your letter, and that itself cites *Apple Corps*, "The use of private investigators,
posing as consumers and speaking to nominal parties who are not involved in any aspect of the
litigation, does not constitute an end-run around the attorney/client privilege," where
investigators do not induce parties to make statements they would not otherwise have made
within the normal business routine.  *Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 82 F. Supp.
2d 119, 125-26 (S.D.N.Y. 1999) (finding no ethical violations occurred where the plaintiff had
hired two private investigators who posed as customers of the defendant, visited showrooms and
secretly recorded conversations with employees).

**WILSON SONSINI**

Joseph M. Paunovich
May 9, 2023
Page 2


      We reiterate that the activities of the investigators (or the agents of the investigators) engaged by WSGR were proper under the ethical rules.  Nonetheless, we confirm that no further T&M USA investigations are ongoing.  Our communications with T&M USA and its communications with its agents are protected by the attorney-client privilege and/or the work product doctrine, which we assert.  However, we do not have an objection to providing you with access to the communications between T&M USA or its agents and Motif, which we believe should allay your concerns.  We are also willing to meet and confer regarding this issue if you believe it is necessary.

Sincerely,

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

*/s/ Wendy L. Devine*

Wendy L. Devine


**CC:** All counsel of record (via e-mail)

# EXHIBIT 3

# WILSON SONSINI

Wilson Sonsini Goodrich & Rosati
Professional Corporation

650 Page Mill Road
Palo Alto, California 94304-1050

O: 650.493.9300
F: 650.493.6811

MATTHEW R. REED
Internet: MREED@wsgr.com
Direct dial: 650-565-3990

May 12, 2023

**Contains Confidential Information**

Joseph M. Paunovich, Esq.
QUINN EMANUEL
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543

Re:   **Impossible Foods Inc. v. Motif FoodWorks, Inc., C.A. No. 22-311 (WCB)**

Dear Joe:

I write in further response to your letter to Wendy Devine dated April 25, 2023, the letter from Wendy Devine to you dated May 9, 2023, our telephone discussion yesterday afternoon, and the email from Geoff Kirsner earlier today.

As an initial matter, and although we will not correct every mischaracterization in Mr. Kirsner's email, his statement that "Impossible has now admitted that it is behind this illicit conduct" merits attention. We have not admitted to engaging in any illicit conduct, and there was no illicit conduct.

During our discussion yesterday, and in Mr. Kirsner's email today, Motif stated its intent to seek relief from the Court on the issue of WSGR's engagement of a private investigation firm to obtain samples of Motif products. We understand that Motif intends to request (1) an order compelling production of all documents and communications regarding the investigation between WSGR and the investigators, between Impossible Foods and the investigators (of which there are none), between Impossible Foods and WSGR, and among the investigators; and (2) a protective order prohibiting further investigation.

The documents and communications that would fall within the scope of item (1) above are not relevant to any party's claim or defense in this case. Further, Impossible Foods will not use as evidence any information obtained through a post-complaint investigation in this case and in any event, no evidence was received by Wilson Sonsini or its client, Impossible Foods. This obviates any need to seek the relief identified in item (1) above.

**WILSON
SONSINI**

Joseph M. Paunovich, Esq.
May 12, 2023
Page 2

        We have informed you that no further investigations are ongoing and we will not
conduct any further investigations using a private investigation firm, which obviates
any need to seek the relief identified in item (2) above.

        In addition to the two items identified above, you stated that Motif may seek
additional relief and/or sanctions.  We asked you to identify the specific relief you
would seek, but you did not do so.  If Motif intends to seek any additional relief and/or
sanctions from the Court, please identify them and we will promptly meet and confer
with you in an effort to resolve the parties' dispute without Court involvement.

        You also asked if we would provide a privilege log listing the communications
that would fall within the scope of item (1) above.  As those communications are not
relevant to any party's claim or defense in this case, and consistent with the parties'
agreements that such communications need not be included on a privilege log, we will
not provide a privilege log.

                        Respectfully,

                        WILSON SONSINI GOODRICH & ROSATI
                        Professional Corporation

                        */s/ Matthew R. Reed*

                        Matthew R. Reed

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| SITE 2020 INCORPORATED,<br><br>        Plaintiff,<br><br>vs.<br><br>SUPERIOR TRAFFIC SERVICES, LLC,<br><br>        Defendant. | CV 21-63-M-DLC-KLD<br><br><br>FINDINGS & RECOMMENDATION |
| SUPERIOR TRAFFIC SERVICES, LLC and SUPERIOR TRAFFIC SYSTEMS, LLC,<br><br>        Counterclaim-Plaintiffs,<br><br>vs.<br><br>SITE 2020 INCORPORATED,<br><br>        Counterclaim-Defendant. | |

        This patent infringement case comes before the Court on Defendant and

Counterclaim-Plaintiff Superior Traffic Services, LLC and Counterclaim-Plaintiff

Superior Traffic Systems, LLC's (collectively "Superior Traffic") motion for leave

to file Third Amended Counterclaims (Doc. 78) and motion for sanctions based on

alleged litigation misconduct by Plaintiff and Counterclaim-Defendant Site 2020

Incorporated ("Site 2020"). (Doc. 98). Having considered the arguments and

evidence presented, the Court recommends that Superior Traffic's motion for leave to file its proposed Third Amended Counterclaims and motion for sanctions be granted in part as set forth below.

## I.   **Procedural Background**

Site 2020 and Superior Traffic are competitors in the portable traffic signal industry. Site 2020 initiated this patent infringement action against Superior Traffic in May 2021, alleging that Superior Traffic's portable traffic management systems infringe on multiple claims of two Site 2020 patents. (Docs. 1 and 29). Superior Traffic has asserted several counterclaims, including a patent infringement counterclaim accusing Site 2020's Guardian Portable Traffic Light ("Guardian PTL") of infringing Superior Traffic's U.S. Patent No. 9,135,817, titled "Traffic Management System" (the '817 Patent"). (Docs. 15, 30, and 47 at 71 ¶ 137).

Site 2020 moved to dismiss Superior Traffic's patent infringement counterclaim pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim for relief. (Doc. 48). On April 1, 2022, the undersigned issued Findings and Recommendation, recommending that Site 2020's motion to dismiss be denied.[1] (Doc. 72). Two weeks later, Superior Traffic moved for leave file Third Amended Counterclaims, claiming it had only recently learned that Site 2020's

---

[1] Site 2020 did not file objections to the Findings and Recommendation, which is awaiting review by presiding United States District Court Judge Dana L. Christensen.

Guardian PTL was never commercialized and seeking leave to amend its infringement counterclaim to instead identify Site 2020's flagship traffic management system – the Guardian SmartFlagger AFAD – as the accused product. (Doc. 78). At the time Superior Traffic filed its motion to amend its counterclaims in mid-April, the parties had completed *Markman* briefing and a *Markman* hearing was scheduled for May 17, 2022. (Doc. 71). In light of the issues raised by the parties in connection with Superior Traffic's motion to amend its counterclaims, however, the Court vacated the *Markman* hearing and held a status conference on May 17, 2022 instead. (Docs. 85 and 88).

During the status conference, Superior Traffic raised allegations of litigation misconduct that form the basis of the pending motion for case terminating sanctions against Site 2020. Given the seriousness of Superior Traffic's allegations, the Court vacated the pretrial scheduling order, permitted limited discovery on the matters raised by Superior Traffic, and established briefing deadlines for Superior Traffic's anticipated motion for sanctions. (Doc. 89). The Court held a hearing on the motion on December 13, 2022, and makes the following factual findings based on the evidence of record.

## II.  <u>Motion for Sanctions</u>

### A.  **Factual Findings**[2]

---

[2] Citations to the evidentiary record will consist of (1) the exhibit number

Site 2020 is a corporation with its principal place of business in Nova Scotia, Canada. (Doc. 29 at ¶ 11).  At all times relevant to this motion, Mitchell Hollohan was Site 2020's Chief Executive Officer (Ex. 25 Doc. 101-20 at 14 [48:15-19]), Trevor Romkey was its Chief Operations Officer (Ex. 24 Doc. 101-19 at 5-6 [13:18-14:13]), and Chris Edelman was its Vice President of Sales and Operations (Ex. 24 Doc. 101-19 at 6 [16:6-12]; Ex. 25 Doc. 101-20 at 60 [232:22-233:7]).

The two Superior Traffic entities are limited liability companies with a principal place of business in Missoula, Montana. (Ex. 32 Doc. 99-33 at ¶ 1). Jeff Hollenback is Superior Traffic's President and Chief Executive Officer. (Ex. 32 Doc. 99-33 at ¶ 1).

Site 2020 and Superior Traffic compete in providing portable traffic signals, including Automated Flagger Assistance Devices ("AFADs") to road construction and maintenance companies, among others. (Ex. 25 Doc. 101-20 at 8 [23:3-9], 25 [92:2-6], 76-77 [297:24-298:5]; Ex 24 Doc. 101-19 at 9 [28:4-13]; Ex 18 Doc. 101-15 at 55 [209:13-20]). In February 2021, Superior Traffic made a business pitch to Southwest Safety, a New Mexico-based company that operates in the road construction and maintenance business, about the possibility of doing business

---

referenced by the parties in the briefing; (2) the corresponding unredacted document number generated by the Court's Case Management/Electronic Case Filing system; and (3) pinpoint cites to the CM/ECF page number and/or document paragraph/line numbers.

together. (Ex. 18 Doc. 101-15 at 13-14 [44:22-46:24]; Ex. 29 Doc. 101-21 at 11
[34:21-35:23]). The meeting, which took place at Southwest Safety's facility in
Albuquerque and was attended by Mike Biggers, then a Superior Traffic regional
sales representative, and George Thompson, Southwest Safety's Sales Manager
and Estimator, did not lead to a business relationship. (Ex. 18 Doc. 101-15 at 19
[67:17-68:6]; 22 [77:15-78:11], 24 [85:23-86:2]; Ex 29 Doc. 101-21 at 11 [36:2-
7]).

    In May 2021, the same month that Site 2020 filed this lawsuit, persons or
entities controlling Site 2020 acquired a controlling interest in Southwest Safety.
(Ex 25 Doc. 101-20 at 54-55 [209:15-212:17]; Ex 6 Doc. 101-4 at 5 [11:20-13:2];
Ex. 26 Doc. 99-27). Site 2020's Chief Operations Officer, Romkey, assumed
operational control of Southwest Safety. (Ex. 1 Doc. 101-1 at 9 [29:1-15]).

    In August 2021, Site 2020 posted a testimonial video by Southwest Safety
for Site 2020's Guardian SmartFlagger AFAD. (Ex. 27 Doc. 99-28; Ex 25 Doc.
101-20 at 50 [192:16-196:20]; Ex. 28 Doc. 99-29). The video featured Hollohan
and Southwest Safety's president at the time, Jeff Garrett, but did not reveal
Southwest Safety's affiliation with Site 2020. (Ex. 1 Doc. 101-1 at 9 [26:18-
27:10]; Ex. 25 Doc. 101-20 at 50 [193:16-18]; Ex. 18 Doc. 101-15 at 61 [234:23-
237:4]; Ex. 28 Doc. 99-29 (digital format). After learning of the video, Superior
Traffic contacted Garrett to see if Southwest Safety would be willing to entertain

another business pitch from Superior Traffic. (Ex 18 Doc. 101-15 at 27 [100:16-101:16], 61 [234:23-237:4]). When Superior Traffic initiated this contact, it was not aware that Site 2020 and Southwest Safety were affiliated. (Ex. 18 Doc. 101-15 at 35 [131:17-20]).

Romkey, who by this time was managing operations at Southwest Safety, conveyed Superior Traffic's overture to his colleagues in Site 2020's leadership, including Hollohan. (Ex. 1 Doc. 101-1 at 7 [20:23-21:8], 9 [29:9-15], 10 [31:10-32:2]; Ex 25 Doc. 101-20 at 57 [219:19-24])). Romkey instructed Thompson to accept Superior Traffic's offer to provide another product demonstration, to take place at Southwest Safety's facility in Albuquerque. (Ex. 1 Doc. 101-1 at 10 [32:15-33:15], 12 [40:2-41:1]; 13 [42:14-43:22]). Thompson and Biggers scheduled the meeting for December 8, 2021. (Ex. 1 Doc. 101-1 at 12 [40:2-4], 30 [110:20-111:21; 112:1-113:6]; Ex. 4 Doc. 99-5; Ex. 5 Doc. 99-6).

As an additional inducement to meet, Thompson told Biggers that Southwest Safety was no longer under contract with Site 2020. (Ex. 29 Doc. 101-21 at 20 [69:20-70:2], 21 [74:22-75:12]). Thompson also told Biggers that Southwest Safety's owner would be present at the meeting, so Biggers asked Superior Traffic's President and Chief Executive Officer, Jeff Hollenback, to attend. (Ex. 18 Doc. 101-15 at 5 [11:15-12:17]; Ex. 29 Doc. 101-21 at 28 [102:25-103:17]). Southwest Safety did not tell Biggers that Garrett had sold the company or that it

was now affiliated with Site 2020. (Ex. 29 Doc. 101-21 at 28 [103:14-17]).

Prior to the meeting, Romkey suggested that Site 2020's field operations manager, Quinn Graham, attend the meeting. (Ex. 6 Doc. 101-4 at 7 [18:21-21:8]). In the days leading up to the meeting, Romkey, Graham, and Hollohan planned to have Graham attend the meeting posing as a Southwest Safety employee. (Ex 6 Doc. 101-4 at 7 [18:21-21:8], 9 [27:14-29:20], 18 [63:8-64:8, 64:24-65:16]; Ex. 9 Doc. 101-6; Ex. 10 Doc. 101-7). At his deposition on May 31, 2022, Graham testified that he discussed his plans to attend the meeting with Romkey, Hollohan, and Edelman. (Ex. 6 Doc. 101-4 at 7 [18-21-21:8]. Graham further testified that prior to the meeting, he and Romkey specifically discussed the fact that Graham was not going to use his real name during the meeting. (Ex. 6 Doc. 101-4 at 9 [27:14-29:20]).

Graham also testified about two email conversations, the first of which started with a November 29, 2021, email in which Graham asked Thompson to select a day and time for the meeting the following week. Graham and advised Thompson "It's important you don't cc me in the emails or mention who I am. I'll come up with a fake name next week." (Ex. 6 Doc. 101-4 at 18 [63:10-15]; Ex. 9 Doc. 101-6 at 4-5). Thompson responded that he had requested the meeting, and on December 1, 2021, he emailed Graham stating that the product demonstration was "setup for Wednesday at 0900. Last time he wanted to do the demo inside and

walked through the warehouse. Are we going to do something with the Site 2020 equipment?"[3] (Ex. 9 Doc. 101-6 at 2-3). Graham forwarded the email to Hollohan, asking "What do you think? Leave the equipment? Move it?" (Ex 9 Doc. 101-6 at 2). Copying Romkey, Hollohan responded: "Tell him he can't come into the warehouse. COVID." (Ex. 9 Doc. 101-6 at 2).

In another email chain about scheduling the meeting, Graham emailed Romkey on December 2, 2021 saying "Getting there." Romkey responded on December 7, 2021, the day before the meeting, asking "All set up? You got a game plan?" (Ex. 10 Doc. 101-7 at 2).  This email was copied to Hollohan, who responded the next day, copying Graham: "Quinn can you download gmail on your phone? I think you get lost in your emails and they sit……….." (Ex. 10 Doc. 101-7 at 2).

At Graham's request, Site 2020's IT department created an email address for a fictitious person, Michael (Mike) Evans, at mevans@swsafetyservices.com, and gave Graham control of it. (Ex. 6 Doc. 101-4 at 11 [37:1-39:11], 12 [41:24-42:12]). Site 2020 also made a fake email signature for Graham posing as Mike Evans, which contained Southwest Safety's logo, address, and business phone number, as well as Graham's personal cell phone number. (Ex. 6 Doc. 101-4 at 11

---

[3] At the time, a number of Site 2020 Guardian SmartFlagger AFADs were being held in Southwest Safety's warehouse.

[36:14-37:9], 12-13 [41:7-43:2]; Ex. 7 Doc. 99-8). Romkey, Hollohan, and Edelman also provided Graham with questions to ask Superior Traffic during the meeting. (Ex. 6 Doc. 101-4 at 11 [35:2-16], 18-19 [65:17-66:23]).

Shortly before Hollenback and Biggers arrived for the meeting on December 8, 2021, Graham installed a GoPro audiovisual recording device in the Southwest Safety warehouse where the product demonstration would take place. (Ex. 6 Doc. 101-4 at 18 [63:8-64:23], 34 [126:4-128:13]; Ex. 14 Doc. 101-11 at 00:00-00:17). Graham wore a Southwest Safety jacket during the demonstration, which lasted more than an hour and was recorded by the GoPro. (Ex. 1 Doc. 101-1 at 18 [64 :10-65:18], 19 [67 :13-19, 69 :8-11], 20 [71:9-15]; Ex. 6 Doc. 101-4 at 9 [29:21-30 :1], 26 [96:2-20], 35 [132 :7-10];  Ex. 14 Doc. 101-11; Ex. 15 Doc. 101-12; Ex. 16 Doc. 101-13; Ex. 17 Doc. 101-14). As Graham had instructed, Thompson introduced him to Hollenback and Biggers as Southwest Safety's general manager, Mike Evans. (Ex. 6 Doc. 101-4 at 8 [22:7-25], 34-35 [129:11-131:5]; Ex. 29 Doc. 101-21 at 6 [16:16-25], 27-28 [97:9-102:15], 31 [113:12-21], 33-34 [124:22-125:13]; Ex. 14 Doc. 101-11, at 10:26-10-:37).

As directed by Hollohan, Romkey, and Edleman, Graham asked Hollenback and Biggers about several aspects of the technology used in Superior Traffic's AFAD units. Hollenback and Biggers provided extensive narrative answers on topics including: (1) automatic and manual mode operation (Ex. 6 Doc. 101-4 at 36

[137:1-3], 37 [138:8-10]; Ex. 18 Doc. 101-15 at 62 [240:14-24]; Ex. 15 Doc.101-12 at 00:00-5:50); (2) unit communication functionality (Ex. 6 Doc. 101-4 at 37 [140:8-16, 141:11-24]; Ex. 18 Doc. 101-15 at 62 [240:6-13]; Ex. 16 Doc. 101-13 at 06:11-07:02); (3) video feed communication functionality (Ex. 6. Doc. 101-4 at 19-21 [69:11-77:4]; Ex. 11 Doc. 101-8 at 5; Ex. 14 Doc. 101-11 at 14:06-14:20); Ex. 16 Doc. 101-13 at 0:00-0:33); (4) unit control (Ex. 11 Doc. 101-8 at 4-5; Ex. 15 Doc. 101-12 at 09:35-11:05; 11:46-13:20; 14:27-17:13); (5) network operations center control and functionality (Ex. 11 Doc. 101-8 at 4; Ex. 14 Doc. 101-11 at 16:30-16:40; Ex. 17 Doc.101-14 at 9:22-10:20); (6) how the units are towed in tandem (Ex. 11 Doc. 101-8 at 4; Ex. 14 Doc. 101-11 at 12:32-12:53; Ex. 17 Doc. 101-14 at 3:01-04:44); (7) who manufactures the units (Ex. 6 Doc. 101-4 at 20 [71:14-17]; Ex. 18 Doc. 101-15 at 62 [239:25-240:5]; Ex. 11 Doc. 101-8 at 4; Ex. 16 Doc. 101-13 at 8:50-09:12, 09:44-10:03); (8) solar power to the units (Ex. 17 Doc. 101-14 at 12:34-12:45); and (9) TESS mobile app functionality (Ex. 29 Doc. 101-21 at 32 [119:24-120:19]; Ex. 15 Doc. 101-12 at 0:59-1:25, 11:45-12:30, 14:27-17:13).

The meeting then moved to a conference room, where Hollenback and Biggers provided Graham and Thompson with a proposal regarding a prospective partnership between Superior Traffic and Southwest Safety. (Ex. 18 Doc. 101-15 at 60 [229:15-230:20]). This portion of the meeting lasted more than an hour, during

which time Graham questioned Hollenback and Biggers about a variety of business matters. (Ex. 18 Doc. 101-15 at 60 [229:15-230:20]; Ex. 29 Doc. 101-21 at 28-29 [103:18-105:24]) Hollenback and Biggers provided narrative answers divulging business information regarding: (1) how Superior Traffic makes its software available (Ex. 6 Doc. 101-4 at 20 [69:11-71:10]); (2) a new business relationship model for Superior Traffic's partners (Ex. 18 Doc. 101-15 at 29-31 [106:11-112:16, 114:23-115:8, 116:5-12]); and (3) Superior Traffic's efforts with regard to regulation (Ex. 18 Doc. 101-15 at 58 [221:4-224:1]; Ex 14 Doc. 101-11 at 13:11-13:53; Ex. 16 Doc. 101-13 at 14:07-15:04). Superior Traffic had only disclosed this information to two other potential business partners and would not have divulged it during the meeting had it not viewed Southwest Safety as a trustworthy potential business partner. (Ex. 18 Doc. 101-15 at 31-32 [115:9-118:4], 57 [217:24-220:8], 68 [264:1-8]; Ex. 32 Doc. 99-33 ¶ 9).

Graham also elicited information regarding the cost of Superior Traffic's units, where they are made, and how Superior Traffic's contracts work. (Ex. 29 Doc. 101-21 at 23 [83:14-84:4], 27-29 [97:9-105:24], 33 [122:7-25], 40 [151:3-152:18]; Ex. 6 Doc. 101-4 at 13 [44:6-45:9], 20 [71:7-73:19], 25 [90:12-91:14]; Ex. 22 Doc. 101-17). As the meeting was ending, Superior Traffic agreed to leave the two AFAD units it brought to the demonstration with Southwest Safety so that

it could test the units at a jobsite in New Mexico.[4] (Ex. 1 Doc. 101-1 at 16-17 [57:19-58:13]; Ex. 6 Doc.101-4 at 10 [30:2-25]; Ex. 18 Doc. 101-15 at 35 [129:12-130:4]; Ex. 29 Doc. 101-21 at 34 [127:1-128:2]).

At no time during the course of the meeting did Site 2020 or Southwest Safety inform Superior Traffic that the two entities were affiliated with one another (Ex. 1 Doc. 101-1 at 31 [115:16-116:17]; Ex. 29 Doc. 101-21 at 28 [103:14-17]); that Mike Evans was actually Site 2020's operations manager, Quinn Graham (Ex. 6 Doc. 101-4 at 8 [23:11-24:2]); or that they had recorded the product demonstration. (Ex. 6 Doc. 101-4 at 34 [128:14-17]). In the days that followed, Graham conveyed what he had learned during the meeting with Superior Traffic to Hollohan, Romkey, and Edelman. (Ex. 6 Doc. 101-4 at 10 [31:15-32:8, 32:23-33:9], 11 [34:2-21], 19-20 [69:11-72:16], 28-29 [105:13-107:16]; Ex. 11 Doc.101-8 at 4-7). Graham provided Hollohan, Romkey, and Edelman with the audiovisual recording of the meeting, as well as several photographs he took of Superior Traffic's AFAD units during the demonstration. (Ex. 6 Doc.101-4 at 10 [32:9-22], 19-20 [69:11-70:4], 28 [102:11-103:20], 32-34 [121:23-126:3]; Ex. 11 Doc. 101-8 at 4; Ex. 13 Doc. 101-10). Superior Traffic was not aware that Graham had

---

[4] Biggers resigned from Superior Traffic the day after the meeting, for reasons that are unrelated to this litigation and Superior Traffic's motion for sanctions. (Ex. 21 Doc. 99-22).

communicated this information to Site 2020's leadership. (Ex. 32 Doc. 99-33 at ¶5).

On January 6, 2022, Hollenback and Superior Traffic's Vice President of Sales and Operations, Mike Davis, received a call from an individual who identified himself as Isaac Cutrer, a former Southwest Safety employee. (Ex. 18 Doc. 101-15 at 35-36 [131:17-133:7], 37 [137:23-138:14]). Cutrer advised Hollenback and Davis that the individual posing as Southwest Safety employee Mike Evans during the meeting on December 8, 2021, was actually Site 2020 employee Quinn Graham. (Ex. 18 Doc. 101-15 at 35-36 [131:17-133:7], 37 [137:23-138:14]). According to Hollenback, Cutrer described it as "some real covert shit." (Ex. 18 Doc. 101-15 at 35 [132:7-8]). Cutrer had gotten his information from Robert Sanchez, who had volunteered it to Cutrer as "covert spy shit" in December 2021. (Ex. 20 Doc. 99-21 at 5-9). Superior Traffic never communicated with Sanchez, and did not know anything about him or his involvement until Cutrer forwarded Sanchez's texts to Superior Traffic on January 6, 2022. (Ex. 18 Doc. 101-15 at 38 [142:18-143:7], 62 [237:12-19]; Ex. 20 Doc. 99-21; Ex. 32 Doc. 99-33 at ¶ 4).

Superior Traffic asked Cutrer if he would be willing to take photographs of the AFAD units. (Ex. 18 Doc. 101-15 at 38 [142:18-143:7], 38-40 [144:23-145:13, 149:3-25]; Ex. 20 Doc. 99-21) Cutrer agreed, and texted the photographs to

13

Superior Traffic later that day. (Ex. 18 Doc. 101-15 at 41 [156:5-9]; Ex. 20 Doc. 99-21). Based on Cutrer's description of where the AFADs were located, Superior Traffic assumed Cutrer would be able to take the requested photographs from off Southwest Safety's property. Superior Traffic did not ask Cuter to enter Southwest Safety's premises to obtain the photographs. (Ex. 18 Doc. 101-15 at 41 [155:9-16, 156:10-13], 42 [157:12-15, 158:4-23]).

As reflected in the photographs, someone had disassembled the Superior Traffic AFAD units' control devices after the product demonstration. (Ex. 6 Doc. 101-4 at 30 [113:12-14]; Ex. 18 Doc. 101-15 at 42 [159:13-18]; Ex. 20 Doc. 99-21). Superior Traffic arranged for a contract hauler to retrieve its AFAD units the next day. (Ex. 18 Doc. 101-15, at 36 [133:23-134:9, 135:11-136:15]). Acting on instructions from Romkey and Edelman, and still posing as Mike Evans, Graham emailed Davis several times in mid-January 2022 asking Superior Traffic to return the units. (Ex. 6 Doc. 101-4 at 11 [36:14-37:9], 13-14 [43:3-46:5], 14 [49:12-16], 22 [81:10-82:11]; Ex. 7 Doc. 99-8; Ex. 12 Doc. 101-9). Romkey instructed Graham to tell Superior Traffic that if it would return the AFAD units, Southwest Safety would commit to entering into a contract with Superior Traffic. (Ex. 6 Doc. 101-4 at 14 [48:16-49:2]). In his emails, Graham continued to portray Southwest Safety as arm's length from Site 2020, telling Davis, "As far as Site 2020 – we are having some customer support issues .. [sic] which is one thing I really like about

STS." (Ex. 7 Doc. 99-8 at 2).

Hollenback has made clear that Superior Traffic would not have agreed to the December 8, 2021, meeting had it known it was presenting to an employee of its litigation opponent, Site 2020. (Ex. 18 Doc. 101-15 at 59 [227:22-228:7]).

### B.    Legal Standard

Because the decision to sanction a litigant "is one that is not unique to patent law," regional circuit law provides the controlling legal standard. *United Construction Products. Inc. v. Tile Tech, Inc.*, 843 F.3d 1363, 1367-68 (Fed. Cir. 2016). District courts have the power to impose sanctions for litigation misconduct under the both the Federal Rules of Civil Procedure and the court's inherent authority. *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006). "Regardless of the source of authority relied upon, the district court has broad discretion to fashion appropriate sanctions." *Webster v. Psychiatric Medical Care, LLC*, 386 F.Supp.3d 1358, 1362 (D. Mont. 2019) (citing *Leon*, 464 F.3d at 958). See also *Pruco Life Ins. Co v. California Energy Development Inc.*, 2022 WL 1037111 at *10 (S.D. Cal. Apr. 6, 2022) (explaining that a district court "has broad fact-finding powers with respect to sanctions, and its findings warrant great deference"). This "deference extends to the [c]ourt's credibility determinations." *Pruco Life Ins.*, 2022 WL 1037111, at *10 (citing *Hernandez v. City of El Monte*, 138 F.3d 393, 398 (9th Cir. 1998)).

Superior Traffic requests sanctions under the Court's inherent authority. District courts have the inherent power to impose sanctions for a "full range of litigation abuses." *Evon v. L. Offices of Sidney Mickell*, 688 F.3d 1015, 1035 (9th Cir. 2012). See also *Fink v. Gomez*, 239 F.3d 989, 992 (9th Cir. 2001) (Courts have "the inherent authority to impose sanctions for bad faith, which includes a broad range of willful improper conduct.").

When acting under its inherent authority, "a district court must find either: (1) a willful violation of a court order; or (2) bad faith." *America Unites for Kids v. Rousseau*, 985 F.3d 1075, 1090 (9th Cir. 2021). "A determination that a party was willfully disobedient is different from a finding that a party acted in bad faith. Either supports the imposition of sanctions." *America Unites*, 985 F.3d at 1090 (quoting *Evon*, 688 F.3d at 1035). "[A] 'willful' violation of a court order does not require proof of mental intent such as bad faith or an improper motive, but rather, it is enough that a party acted deliberately." *America Unites*, 985 F.3d at 1090 (citing *Evon*, 688 F.3d at 1035). Bad faith, on the other hand, "includes conduct done vexatiously, wantonly, or for oppressive reasons, requires proof of bad intent or improper purpose." *America Unites*, 985 F.3d at 1090.  Bad faith may "be found in the conduct of the litigation." *America Unites,* 985 F.3d at 1090.

"[B]ecause a district court's inherent powers are so potent," the Ninth Circuit requires "that when a court imposes sanctions based on bad faith, the court must make an explicit finding that the sanctioned party's conduct 'constituted or was tantamount to bad faith'." *America Unites*, 985 F.3d at 1090 (citing *Primus Auto Fin. Servs., Inc. v. Batarse*, 115 F.3d 644, 648-50 (9th Cir. 1997)).  See also *Leon*, 464 F.3d at 961; *Lahiri v. Universal Music and Video Distribution Corp.*, 606 F.3d 1216, 1219 (9th Cir. 2010). The party requesting sanctions bears the burden of establishing that sanctions are warranted. See *Ryan v. Editions Ltd. W., Inc.*, 786 F.3d 754, 766 (9th Cir. 2015); *Wooten v. BNSF Railway Co.*, 2018 WL 2417858, at *8 (D. Mont. May 29, 2018).

Courts have the inherent authority to impose case terminating sanctions when "a party has engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings" or "has willfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice." *Leon*, 464 F.3d at 958. Case terminating sanctions may also be appropriate if the litigation misconduct "relates to the matters in controversy in such a way as to interfere with the rightful decision of the case." *Renner v. Takeda Pharmaceuticals U.S.A. Inc.*, 2017 WL 120852 at *2 (D. Mont. Jan. 12, 2017) (quoting *United States v. Natl. Med. Enterprises, Inc.*, 792 F.2d 906, 912 (9th Cir. 1986)).

Before imposing case terminating sanctions, courts should consider five factors: "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions." *Leon*, 464 F.3d at 958. While the court need not make explicit findings for each factor, it cannot impose dismissal or other terminating sanctions without a finding of "willfulness, fault, or bad faith." *Leon*, 464 F.3d at 958 (quoting *Anheuser-Busch, Inc. v. Natural Beverage Distributors*, 69 F.3d 337, 348 (9th Cir. 1995)).

## C.    Discussion

Superior Traffic argues Site 2020 has engaged in litigation misconduct that goes to the heart of the case, implicates several critical interests, and warrants severe, case terminating sanctions. Specifically, Superior Traffic asks the Court to dismiss Site 2020's patent infringement claims with prejudice and enter default judgment against Site 2020 on all 17 of Superior Traffic's counterclaims.  (Doc. 98 at 2).

Superior Traffic maintains that such severe sanctions are warranted because Site 2020's litigation misconduct is inextricably intertwined with the merits of the claims and counterclaims that are at issue in the case. Site 2020's pleadings allege that Superior Traffic's AFAD product infringes on two Site 2020 patents

18

protecting the AFAD products it has developed.  (Doc. 1 at ¶¶ 40-50; Doc. 29 at ¶¶

46-67). Superior Traffic has asserted several counterclaims, including claims for

infringement of its '817 Patent; false advertising, unfair competition, and related

torts; and antitrust and related anticompetition counterclaims.[5] (Doc. 47 at ¶¶ 65-

146).

    The AFAD unit that Superior Traffic demonstrated at the December 8, 2021

meeting is the same product that Site 2020 accuses of infringing its patents.

Hollenback – who co-developed the accused AFAD's technology and is a named

inventor on the '817 Patent (Ex. 32 Doc. 99-33 at ¶ 2) – and Biggers were

questioned at length by Graham during the meeting and provided narrative answers

about several matters that are relevant to Site 2020's patent infringement claims

and the technology involved. As detailed above, the matters discussed included,

among others, automatic and manual mode operation; unit communications

functionality; video functionality; network operations functionality; and solar

power to the AFAD units. That these topics are relevant to Site 2020's patent

infringement claims is evident from its preliminary infringement contentions for

---

[5] As previously mentioned, Superior Traffic has moved for leave to amend its
counterclaims to identify Site 2020's accused product as the Guardian
SmartFlagger instead of the Guardian PTL. Superior Traffic's proposed amended
counterclaims would also provide additional factual allegations in support of its
counterclaims for false advertising, unfair competition, and related torts. (Doc. 78).
Superior Traffic's motion to amend is discussed below.

U.S. Patent No. 10,249,186, which contain allegations relating to the accused AFAD's automatic and manual mode operation (Ex. 30 Doc. 99-31 at 10, 22-24; 31); cellular, wifi, and MHz communications (Ex. 30 Doc. 99-31 at 8, 21-22, 25, 35); video functionality (Ex. 30 Doc. 99-31, 12); network operations center functionality (Ex. 30 Doc. 99-31 at 17); and use of solar power (Ex. 30 Doc. 99-31 at 20).[6]

Site 2020 also obtained information on matters relevant to some of Superior Traffic's counterclaims, including particularly those based on Site 2020's alleged false and misleading advertising. For example, Superior Traffic claims Site 2020 distributed a Competitor Audit flyer that falsely or misleadingly described several aspects of Superior Traffic's AFAD units, including how they are towed, their flexibility to work in different types of work modes, their use of solar power, and their long-range connectivity and video functionality. (Doc. 47 at 47 ¶¶ 22-31). As described above, Hollenback and Biggers touched on each of these topics during the December 8, 2021, product demonstration.

Superior Traffic contends Site 2020 thus obtained an array of information relevant to the merits of this litigation through its willfully deceptive conduct. In

---

[6] Site 2020's preliminary infringement contentions for U.S. Patent No. 11,055,993 similarly include allegations that are relevant to many of the same topics. (See Ex. 31 Doc. 99-32).

doing so, Superior Traffic submits, Site 2020 effectively circumvented the Federal

Rules of Civil Procedures governing discovery and deprived Superior Traffic of

the procedural protections to which it was entitled. Superior Traffic maintains that

Site 2020 also interfered with its statutory right to litigate through counsel[7], and

essentially obtained a lengthy, undisclosed, ex parte recorded interview with the

president of its party-opponent on matters relating to the merits of the claims and

counterclaims asserted in the case.

In light of Site 2020's willfully deceptive conduct, Superior Traffic argues,

neither it nor the Court can have any confidence that Site 2020 will conduct itself

honestly as this litigation proceeds. Superior Traffic contends that as a result, it has

been substantially prejudiced by Site 2020's litigation misconduct and the case

terminating sanctions it requests are appropriate.

Site 2020 does not seem to dispute that it obtained information that is

generally relevant to the merits of several claims in this case during the product

demonstration, but argues no sanctions are warranted for two threshold reasons.

First, Site 2020 takes issue with the timing of the motion, and argues Superior

Traffic unduly delayed in requesting sanctions after learning of Site 2020's alleged

misconduct. (Doc. 108 at 8-9; 14-16; 27-30). Superior Traffic was advised by

---

[7] See 28 U.S.C. ¶ 1654 ("In all courts of the United States the parties may plead
and conduct their own cases … by counsel as, by the rules of such courts … are
permitted to manage and conduct causes therein.")

Cutrer on January 6, 2022, that the individual who had identified himself as Southwest Safety employee Mike Evans during the product demonstration was actually Site 2020 employee Quinn Graham. (Ex. 18 Doc.101-15 at 35-36 [131:17-133:7], 37 [137:23-138:14]). Site 2020 faults Superior Traffic for waiting until the hearing on May 17, 2022, to raise the issue of sanctionable conduct with the Court. As Site 2020 describes it, Superior Traffic "and its counsel willfully continued all aspects of the present litigation – including participation in routine discovery, motion practice, document production, witness depositions, and claim construction proceedings - for more than 130 days before informing the Court or Site 2020's counsel of its now-stated belief that Site 2020 had committed litigation misconduct that should result in case-terminating sanctions." (Doc. 108 at 14). Site 2020 points out that Superior Traffic's proposed third amended counterclaims, which were attached as an exhibit to its pending motion for leave to amend on April 14, 2022 (Doc. 80-1), already included allegations relating to Site 2020's conduct at the product demonstration. Superior Traffic did not raise the issue as a basis for sanctions at that time, however, and Site 2020 claims Superior Traffic is now attempting to reform its prior tort allegations into a demand for case terminating sanctions. At bottom, Site 2020 argues the fact that Superior Traffic waited nearly four and a half months to raise the issue as a basis for sanctions undercuts its

allegations as to the seriousness of the misconduct and its request for case
terminating sanctions.

The Court does not find this argument persuasive. The record reflects that
Superior Traffic served deposition notices for Romkey and Hollohan on January
11, 2022, just five days after it was contacted by Cutrer. (Ex. A Doc. 111-1). Site
2020's attorneys were not available for depositions until early March 2022. (Ex. B
Doc. 111-2).  When Superior Traffic deposed Romkey and Hollohan in March
2022, they denied knowing whether Graham identified himself to Superior Traffic
as a representative of Site 2020 during the product demonstration. (Ex. 24 Doc.
101-19 at 51 [195:23-196:8]; Ex. 25 Doc. 101-20 at 58 [222:23-223:1]). Superior
Traffic then issued a subpoena for document production to Southwest Safety, and
on May 6, 2022, Southwest Safety produced the email in which Graham told
Thompson he would "come up with a fake name next week." (Ex. 9 Doc. 101-6 at
5; Ex. 32 Doc. 99-33 at ¶ 3).

Hollenback explains that "[a]lthough Isaac Cutrer's communications alerted
Superior to the fact that Site 2020 had done something fraudulent, I did not know
for sure until receiving documents subpoenaed from Southwest Safety on or about
May 6, 2022, that the 'Michael Evans' we had met at the December 8, 2021,
meeting at Southwest Safety was, in fact, Quinn Graham of Site 2020." (Ex. 32
Doc. 99-3 at ¶ 3). Superior Traffic timely raised the issue with the Court and Site

2020's counsel less than two weeks later, at the hearing on May 17, 2022. The record further reflects that Superior Traffic did not know until Graham's deposition several days after the hearing that Site 2020's senior leadership were personally involved in the fraud. (Ex. 18 Doc.101-15 at 66-67 [256:24-258:6]; Ex. 32 Doc. 99-33 at 3 ¶ 5).

While Superior Traffic included some general factual allegations relating to Site 2020's conduct in the proposed Third Amended Counterclaims it submitted in April 2022 (Doc. 80-1 at 52 ¶ 112), it did not have sufficient evidence that Mike Evans was actually Graham until early May 2022. Thus, to the extent Site 2020 argues Superior Traffic's motion for sanctions should be denied as untimely, the Court concludes otherwise.

Second, Site 2020 maintains that sanctions are not appropriate because Superior Traffic has engaged in misconduct of its own. (Doc. 108 at 16-18, 31-33). For instance, Site 2020 claims that when Superior Traffic asked Cutrer to take photographs of its AFAD units, it encouraged Cutrer to trespass inside Southwest Safety's warehouse. On the day of Cutrer's call, Davis texted Cutrer asking if he "would be willing to drive by and see if you can get a visual on the AFADs" if Cutrer was comfortable he could "do it without being seen." (Ex. A Doc. 109-4 at 2-3). As Hollenback has since testified, based on the information provided by Cutrer, Superior Traffic believed the AFADs were outside of the fence and did not

realize they were inside Southwest Safety's warehouse. Hollenback further
testified that he did not instruct Cutrer to go on Superior Traffic's property, and
would not have done so. (Ex. 18 Doc. 101-15 at 41 [155:9-16; 156:10-13]).
Hollenback's testimony is consistent with Davis's text, which says nothing about
going on Superior Traffic's property or entering its warehouse.

Site 2020 further contends that Superior Traffic and its counsel actively
interfered with Site 2020's deposition of Biggers. (Doc. 108 at 17). Site 2020
asserts that during the hearing on May 17, 2022, Superior Traffic's counsel
mischaracterized Biggers' employment position and his role in the product
demonstration. (Doc. 108 at 17). Superior Traffic concedes that, at the time of the
hearing in May 2022, it mistakenly believed Biggers was a third-party sales
representative and did not make the December 8, 2021 product demonstration.
(Doc. 111 at 9). This inadvertent misstatement does not support Site 2020's
argument that Superior Traffic and its counsel actively interfered with Site 2020's
deposition of Biggers, which was accomplished on June 17, 2022. (Doc. 108 at
17).

Site 2020 additionally asserts that Superior Traffic has improperly targeted
and attempted to steal its customers since the start of this litigation, but does not
point to any evidence that Superior Traffic's conduct consisted of anything other
than legitimate business competition.  To the extent Site 2020 further complains

that Superior Traffic improperly supplied Biggers with materials in advance of his deposition, it has not shown this was improper. As two cases cited by Superior Traffic reflect, it is not uncommon for an entity litigant to prepare an ex-employee for a deposition that is to be conducted in connection with events that took place while the individual was still an employee. See *Peralta v. Cendant Corp.*, 190 F.R.D. 38, 41 (D. Conn 1999); *Simmier, LLC v. Everest Indem. Ins. Co.*, 2021 WL 3773339, at *9 (N.D. Ohio Aug. 25, 2021). The Court therefore finds Site 2020 has not shown that Superior Traffic abused the judicial process or otherwise engaged in litigation misconduct, much less equivalent litigation misconduct, that might preclude it from pursuing sanctions against Site 2020.

Site 2020 also takes the position that no sanctions are warranted because, contrary to Superior Traffic's assertions, its actions have not undermined the integrity of these proceedings. (Doc. 108 at 23-25). Specifically, Site 2020 argues (1) it has not circumvented the discovery rules or deprived Superior Traffic of its right to counsel because it has not, and will not, use any of the information obtained during the product demonstration during this litigation; (2) Graham's attendance at the product demonstration was not related to this litigation, but rather for the purpose of analyzing Superior Traffic's products from a business perspective; and (3) Hollohan and Romkey testified truthfully at their depositions when questioned about the product demonstration. The Court addresses these

arguments below, in conjunction with its assessment of whether Superior Traffic

has met its burden of demonstrating that Site 2020 acted willfully or in bad faith.

### 1.    Willfulness, Fault, or Bad Faith

As explained above, a finding of "willfulness, fault, or bad faith" is required

before a court may impose terminating sanctions against a party under its inherent

power. See *Leon*, 464 F.3d at 958. The Ninth Circuit has not ruled on whether such

a finding must be supported by clear and convincing evidence or a preponderance

of the evidence. *Lahiri v. Universal Music & Video Distribution Corp.*, 606 F.3d

1216, 1219 (9th Cir. 2010). Some district courts "have accordingly applied the

preponderance of the evidence standard when evaluating whether a litigant acted in

bad faith" for purposes of an inherent powers sanctions award, while others have

applied a clear and convincing standard. *Pruco Life Ins. Co. v. California Energy

Development Inc.*, 2022 WL 1037111 *9 (S.D. Cal. Apr. 6, 2022) (collecting

cases). See also *In re Nelson Ricks Cheese Co. Inc.*, 2021 WL 1731765, at *3 (D.

Idaho Apr. 30, 2021) ("Although the specific burden of proof is unsettled in the

Ninth Circuit, the general view is that bad faith or willful misconduct must be

proven by clear and convincing evidence.")

Here, the Court has no difficulty finding by clear and convincing evidence

that Site 2020 acted willfully and in bad faith. Superior Traffic has produced

evidence demonstrating that while this litigation was pending, Site 2020 accepted

Superior Traffic's offer to demonstrate its AFAD product to what it thought was a potential customer, Southwest Safety. Unbeknownst to Superior Traffic, Site 2020 had acquired a controlling interest in Southwest Safety, and Site 2020's chief operating officer, Romkey, had assumed operational control of Southwest Safety. Thompson went so far as to tell Biggers before the meeting that Southwest Safety was no longer under contract with Site 2020, thereby falsely portraying that it was at arm's length from Superior Traffic's litigation opponent, when in fact the two were affiliated.  Neither Site 2020 nor Southwest Safety disclosed this relationship to Superior Traffic before, during, or after the product demonstration.

In the days leading up to the product demonstration, Site 2020 arranged to have its operations manager, Graham, attend the meeting posing as a Southwest Safety employee. Emails exchanged between Hollohan, Romkey, and others prior to Superior Traffic's product demonstration reflect that they were both directly involved in planning to have Site 2020's field operations manager, Graham, attend the demonstration posing as a Southwest Safety employee. For instance, Hollohan and Romkey were part of or copied on the email exchange during which (1) Graham advised Thompson he would come up with a fake name; (2) Thompson expressed concern about what to do with Site 2020's equipment; and (3) Hollohan advised telling Biggers that he could not come in the warehouse because of Covid-19. (Ex. 9 Doc. 101-6). In addition, Hollohan received an email string including

Romkey's email to Graham on the morning of the demonstration asking "All set up? You got game plan?" (Ex. 10 Doc. 101-7).

Site 2020's IT department created a Southwest Safety email address for Graham's fictional persona, Mike Evans, which Graham used to communicate with Superior Traffic prior to the meeting. Shortly before Hollenback and Biggers arrived for the product demonstration at Southwest Safety's warehouse, Graham installed a GoPro audiovisual recording device in the area where the meeting was set to take place. At no point did Graham advise Hollenback or Biggers that he was recording their demonstration of the very AFAD product that is the subject of Site 2020's patent infringement claims. As detailed above, Graham elicited information about Superior Traffic's AFAD technology that is directly relevant to those patent infringement claims and, unbeknownst to Superior Traffic, promptly provided much of that information, including the audiovisual recording, to the rest of Site 2020's leadership.

Through its deceptive conduct, Site 2020 circumvented the Federal Rules of Civil Procedure governing discovery and interfered with Superior Traffic's right to be represented by counsel. As reflected in the audiovisual recording, Site 2020 effectively obtained a lengthy undisclosed recorded interview of its litigation opponent's president and chief operating officer on matters related to the merits of its patent infringement claims. Additionally, the narratives that Graham elicited

from Hollenback and Biggers during the product demonstration amounted to an extended preview of their demeanor and manner of presentation as witnesses.

Even after the product demonstration, Site 2020's deceptive conduct continued. After Superior Traffic retrieved its AFAD units from Southwest Safety's premises, Graham continued to present himself as Mike Evans and, on instructions from Romkey and Edelman, pressed Davis to return the units and continued to falsely portray Southwest Safety as arm's length from Site 2020.

The deceptive conduct of Site 2020's leadership still has not abated, as reflected in the deposition testimony submitted by the parties. In particular, the Court has reviewed the video and transcribed deposition testimony provided by Romkey and Hollohan in March 2022, along with their sworn statements, and finds they are not credible witnesses.

When asked "Do you know whether Mr. Quinn [sic] identified himself to Superior Traffic as a representative of Site 2020?" at the December 8, 2021 meeting, Romkey answered "I would be shocked if he did … but I don't have specific knowledge on that." (Ex. 24 Doc. 101-19 at 51 [195:23-196:8]).  Contrary to Site 2020's argument that this was a truthful statement, the Court finds Romkey's testimony is demonstrably false in light of uncontroverted deposition and email evidence that he knew full well Graham was going to attend the meeting under false pretenses.

Likewise, when asked "Do you know if Superior Traffic was ever informed that he [Graham] was at that meeting?" Romkey responded, "Well, he was there, so I assumed they were informed." (Ex. 24 Doc. 101-19 at 50 [191:5-9]).  The Court finds this testimony is demonstrably false because the record reflects that Romney knew Superior Traffic had been informed that "Mike Evans" of Southwest Safety was attending the meeting.

Finally, the Court notes that Romkey responded to the question, "What is Site 2020's relationship with Southwest Safety?" by answering, "They're a customer" – again obscuring the known affiliation between Site 2020 and Southwest Safety. (Ex. 24 Doc. 101-19 at 35 [132:15-17]). Having watched relevant portions of Romkey's videotaped deposition and reviewed the deposition transcript, the Court finds that Romkey is not a credible witness.

The same is true for Hollohan. For example, when Hollohan was asked during his deposition "Do you know whether Mr. Graham identified himself to Superior Traffic as a representative of Site 2020 at that demo?", he responded "I have no idea. No idea." (Ex. 25 Doc. 101-20 at 58 [222:23-223:1]).  Based on the evidence discussed above, and having watched relevant portions of Hollohan's videotaped deposition and reviewed the transcript, the Court finds his testimony that he has no idea whether Graham identified himself as a representative is not credible.

31

In response to questions about the circumstances leading up to the December 8, 2021, meeting and whether he knew Graham planned on attending, Hollohan answered evasively. Hollohan explained that he "was extremely removed from this one," and repeatedly stated that his information about the meeting was "thirdhand." (Ex. 25 Doc. 101-20 at 55 [212:18-213:9]). Hollohan repeatedly equivocated on the issue of Graham's attendance, testifying for example: (1) "I think there was a chance Quinn [Graham] wasn't even going to be there" (Ex. 25 Doc. 101-20 at 55 [213:14-15]); (2) "[T]here was a chance that he was going to be there for the meeting, but I don't think it was a planned… I don't think it was a planned meeting that Quinn [Graham] quote-unquote, set up" (Ex. 25 Doc. 101-20 at 56 [214:13-19]); (3) "[F]rom what I'm getting from thirdhand information, was that Quinn [Graham], if he was in town, was going to attend the meeting (Ex. 25 Doc. 101-20 at 56 [215:7-9]); (4) the extent of his knowledge prior to the meeting was that if Quinn [Graham] was in town, he would attend the product demonstration, but if he was not in town, he would not attend (Ex. 25 Doc. 101-20 at 56 [216:15-20]); (5) "there was no specific plan" for Graham to attend the meeting (Ex. 25 Doc. 101-20 at 57 [220:9]); and (6) Graham was "like hey, if I'm in town – like this is probably exactly the way the conversation went. Hey, I'm in town. If I'm in (indiscernible) when the Superior guys come in town, I'm going to be there for the demo. If not, I won't be there. I was like, okay, cool. (Ex. 25 Doc. 101-20 at 57 [221:22-222:2]).

The Court finds that Hollohan's testimony as to the extent of his involvement in planning the meeting and his knowledge about Graham's attendance is not credible. Superior Traffic has submitted evidence demonstrating that Hollohan was directly involved in the plan to have Graham attend the meeting by, for example, providing Graham with questions to ask at the meeting and asking Graham to share what he learned during the meeting. (Ex. 6 Doc. 101-4 at 7 [20:11-21:8], 10 [31:15-33:9], 11 [34:2-21, 35:2-6]; Ex. 9 Doc. 101-6 at 2; Ex. 10 Doc. 101-7 at 2; Ex. 11 Doc. 101-8). Graham's deposition testimony and email exchanges prior to the meeting reflect that Hollohan received information about the meeting directly from Graham, not "thirdhand." (Ex. 6 Doc. 101-4, 7 [20:11-21:8], 10 [31:15-33:9], 11 [34:2-21], 18 [63:8-64:6], 19 [69:11-70:18], 28 [105:13-23]; Ex. 9 Doc. 101-6; Ex. 10 Doc. 101-7; Ex. 11 Doc. 101-8). Contrary to Hollohan's testimony, this evidence demonstrates there was no uncertainty as to whether Graham would attend the meeting, and that Site 2020 planned for Graham to attend under false pretenses. Accordingly, and for the reasons detailed above, the Court finds that Hollohan's testimony is not credible.

Hollohan and Romkey are not the only witnesses to have been evasive when testifying about matters relating to the product demonstration. During his deposition on May 12, 2022, Thompson testified as follows under questioning by counsel for Superior Traffic:

Q.    [] Do you know whether Quinn [Graham] introduced himself to Jeff
      [Hollenback] and Mike [Biggers] as Quinn Graham?

A.    I don't know that.

Q.    Do you know how he introduced himself to Jeff and Mike?

A.    I do not know that. I wasn't there.

(Ex. 1 Doc. 101-1 at 18 [63:7-12]). Thompson's testimony flatly contradicts the

video of the product demonstration, which reflects that Thompson *was* there, and it

was he who introduced Graham as Mike Evans to Hollenback and Biggers.

Although Thompson was not directly affiliated with Site 2020, he was the sales

manager for Southwest Safety, which had been acquired by Site 2020 more than

six months earlier.

Site 2020 nevertheless contends that its actions have not undermined the

integrity of these proceedings, and do not amount to willful deceit or bad faith

litigation conduct for a number of reasons. (Doc. 108 at 23-25, 35). Site 2020 does

not disagree that Superior Traffic provided information that could be considered

relevant to the merits of the case during its demonstration of the accused AFAD,

but stands by its position that Graham's "attendance at the demonstration was not

in any way related to present litigation and Site 2020 did not seek to elicit

information to be used in connection with any of the parties' respective claims."

(Doc. 108 at 10). Graham has testified that at the time of the meeting in December

2021, he was not aware that Site 2020 was in active litigation with Superior

Traffic. (Ex. H Doc. 108-4 at 19 [18:4-9]). Graham and Romkey have both

testified that Graham did not attend the meeting for litigation-related purposes, but rather to competitively analyze Superior Traffic's AFAD products from a business perspective. (Ex. H. Doc. 108-4 at 19 [18:4-6], 20 [19:3-19], 35 [34:2-35:1]; 77 [76:16-18]; 120 [119:12-23]; 153-154 [152:5-153:15]; Ex. I. Doc. 108-5 at 193-94 [192:23-193:15], 196-96 [194:8-195:15]; Doc. 109-2 at ¶ 7).

The Court finds Site 2020's assertion that Graham's attendance at the meeting was unrelated to its pending lawsuit against Superior Traffic and was orchestrated solely for the purpose of competitively analyzing Superior Traffic's AFAD products is not supported by the record. Even assuming Graham was not personally aware of the pending litigation, the same cannot be said of Hollohan and Romkey. Site 2020 does not claim that Hollohan and Romkey were unaware of the lawsuit, and the record reflects that they were directly involved in the plan to have Graham attend the meeting under false pretenses, posing as a Southwest Safety employee. And as explained above, the Court finds Romkey's and Hollohan's deposition testimony that they did not know whether Graham introduced himself at the meeting as a representative of Site 2020 is not credible.

Site 2020 further emphasizes that Superior Traffic "makes no claim that Site 2020 has ever used – or attempted to use – any [of the] information [obtained during the meeting] in connection with this lawsuit." (Doc. 108 at 23). Site 2020 argues it would have obtained all of the information provided by Superior Traffic

during the meeting through the normal course of discovery, and even before the meeting it already had enough evidence to prosecute its patent infringement claims. Because it has not used any of the obtained during the meeting in litigating its claims, Site 2020 contends, it has not interfered Superior Traffic's right to counsel.

Even accepting Site 2020's assertion that it has not and will not use any information obtained during the meeting with Superior Traffic in this litigation, this does not change the fact that Site 2020's principals willfully engaged in deceptive conduct toward an opposing party during the course of litigation, circumvented the discovery rules to obtain information relevant to the merits of Site 2020's claims, and in doing so deprived Superior Traffic of the benefit of counsel. That Site 2020 may well have obtained some or all of the same information legitimately during discovery at some later stage in the litigation does not excuse its willful misconduct, which is tantamount to bad faith and has undermined the integrity of these proceedings.

As is often true where one party requests sanctions based on another party's litigation misconduct, the specific factual circumstances at issue here are unique. The Court nevertheless finds that the primary case Superior Traffic relies on to support its argument that Site 2020 has engaged in sanctionable litigation misconduct is analogous and persuasive. *Xyngular Corp. v. Schenkel*, 200

F.Supp.3d 1273 (D. Utah 2016), *aff'd*, 890 F.3d 868 (10th Cir. 2018). In *Xyngular*, the defendant sought terminating sanctions under the court's inherent authority, asserting that a third-party plaintiff had wrongfully encouraged one of the defendant's employees to remove documents from the plaintiff's servers, "and then collected, reviewed, and used those documents in support of his claims" in the case. *Xyngular*, 200 F.Supp.3d at 1311. The plaintiff admitted he was anticipating litigation against the defendant when he was collecting the documents. *Xyngular*, 200 F.Supp.3d at 1317. The court concluded the plaintiff had acted willfully and in bad faith, and that sanctions were appropriate because he had "undermined the legitimacy of the[] proceedings and skirted the discovery process." *Xyngular*, 200 F.Supp.3d at 1317. The court cautioned that litigants "may not engage in self-help by improperly gathering a potential adversary's property," explaining:

> This conduct is an affront to the established rules of engagement and fair play in lawsuits. It amounts to an end-run around the Federal Rules of Civil Procedure, including the rules governing discovery and the orderly exchange of information relevant to disputes presented for resolution in our courts. This conduct undermines the confidence of both litigants and the public in the fairness of judicial proceedings.

*Xyngular*, 200 F.Supp.3d at 1317. The court found by clear and convincing evidence that the plaintiff had "acted willfully, in bad faith, and with fault in a way that abuses the judicial process and undermines the legitimacy of [the] proceedings, and in doing so had committed sanctionable misconduct that

ultimately warranted dismissal of the plaintiff's claims. *Xyngular*, 200 F.Supp.3d at 1319, 1323.

Site 2020 argues *Xyngular* is distinguishable because the plaintiff in that case used the documents he wrongfully obtained to support his claims. Unlike *Xyngular*, Site 2020 contends it has not used, and will not use, any of the information it learned during the December 2021 meeting to advance its position in this litigation, unless the information was otherwise obtained during the normal course of discovery.  Even assuming this is true, it does not excuse Site 2020's conduct. Regardless of whether Site 2020 uses the information in obtained during the meeting to support its claims, the fact remains that Site 2020's principals willfully engaged in deceptive conduct toward an opposing party during the course of litigation, circumvented the discovery rules to obtain relevant information, and in doing so deprived Superior Traffic of the benefit of counsel.

For these reasons, the Court finds by clear and convincing evidence that Site 2020 acted willfully and in bad faith. Site 2020 deliberately engaged in deceptive practices that have undermined the integrity of these judicial proceedings, and its misconduct was utterly inconsistent with the orderly administration of justice. Site 2020 should be sanctioned under the Court's inherent authority for its litigation misconduct. Having concluded that Site 2020 engaged in sanctionable misconduct,

the Court turns next to the Ninth Circuit's five-factor test to determine whether the terminating sanctions Superior Traffic requests are appropriate.

### 2.    Five-Factor Balancing Test

In determining the appropriate sanction, the Court considers the following factors: "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions." *Leon*, 464 F.3d at 958. However, a "district court does not need to make explicit findings regarding each of these factors." *Leon*, 464 F.3d at 958.

"The first two of these factors favor the imposition of sanctions in most cases, while the fourth cuts against a … dismissal sanction. Thus the key factors are prejudice and the availability of lesser sanctions." *Wanderer v. Johnston*, 910 F.2d 652, 656 (9th Cir. 1990). Site 2020's misconduct has led to time consuming sanctions-related litigation, and has made it impracticable for the Court to adhere to the previously established schedule. Thus, as is typically the case, the first two factors weigh in favor of terminating sanctions. See *Leon*, 464 F.3d at 959 n. 5 (finding the first two factors satisfied where the plaintiff's conduct led to "months of sanctions-related litigation"); *Malone v. U.S. Postal Serv.*, 833 F.2d 128, 131 (9th Cir. 1987) (finding the first two factors satisfied where the trial court was

prevented from adhering to its trial schedule). As always, "[t]he fourth factor, the resolution of cases on their merits," weighs against terminating sanctions. *Derith v. Nu Image, Inc.* 648 F.3d 779, 788 (9th Cir. 2011).

The level of sanctions warranted thus turns on the two key factors: the risk of prejudice to Superior Traffic and the availability of less drastic sanctions.

a.   Prejudice

When evaluating the risk and degree of prejudice to the party seeking sanctions, courts look to whether the responding party's actions have "impaired the [moving party's] ability to go to trial or threatened to interfere with the rightful decision of the case." *Leon*, 464 F.3d at 959. See *Anheuser-Busch, Inc.,* 69 F.3d at 348 (quoting *Wyle v. R.J. Reynolds Indus. Inc.*, 709 F.2d 585, 591 (9th Cir. 1983) ("Due process concerns ... require that there exist a relationship between the sanctioned party's misconduct and the matters in controversy such that the transgression 'threaten[s] to interfere with the rightful decision of the case.'").

Superior Traffic argues it has been prejudiced by Site 2020's misconduct in four ways: (1) Site 2020 obtained relevant information without complying with the procedures for obtaining discovery set forth in the Federal Rules of Civil Procedure -- "for example, by obtaining extended narratives it never could have gotten in a deposition"; (2) Site 2020 denied it the benefit of counsel on technological and commercial subject matter; (3) Site 2020 obtained a free advance

look at the demeanor and presentation of Hollenback, one of its central witnesses, and; (4) Site 2020's misconduct fundamentally undermined Superior Traffic's belief in the integrity of the litigation process. (Doc. 106 at 36). The Court agrees.

As argued by Superior Traffic, it was inherently prejudicial for Site 2020 to obtain information relevant to the merits of its patent infringement claims without complying with the rules governing discovery. See *Xyngular*, 200 F.Supp.3d at 1321 (finding prejudice where the plaintiff "[blew] past the rules governing discovery and the parties' right to a neutral forum for resolving discovery disputes" and obtained documents that were relevant to the disputed claims). As a result of Site 2020's failure to comply with the discovery process, Superior Traffic was denied the benefit of legal counsel during a lengthy meeting with its litigation opponent on subject matters related to the merits of the ongoing case between them. In addition, Site 2020 surreptitiously obtained an advance look at the demeanor and presentation of Hollenback, one of Superior Traffic's key witnesses, to Superior Traffic's detriment.

The prejudice Superior Traffic has suffered because of Site 2020's misconduct cannot be minimized. At one point during the sanctions hearing, counsel for Site 2020 inadvertently highlighted the significance of Site 2020's misconduct when addressing Romkey's deposition testimony. (Doc. 124 at 56). Counsel rightly explained that a "deposition … is not like a normal conversation.

41

Your obligation under oath is to tell the truth in response to the question that is asked . . . Did [Superior Traffic] have to push [Romkey] occasionally? Who doesn't have to push a witness to get information?" (Doc. 124 at 56:10-23). This distinction between the adversarial formality of a deposition taken in accordance with established discovery rules and with the benefit of counsel, and unstructured questions and narrative answers during a meeting where one party is attempting to persuade the other to enter into a business relationship, aptly illustrates why Site 2020's conduct towards Superior Traffic, its litigation opponent, was so prejudicial.

Site 2020's misconduct has undermined the integrity of the litigation process, including Superior Traffic's confidence in the federal judicial system. (Ex. 18 Doc. 101-15 at 62 [238:20-239:14). Hollenback states in a supporting declaration that Site 2020's conduct was not consistent with his "expectations of how the civil litigation process is supposed to work," and has left him "feel[ing] personally violated, as though I had been spied or eavesdropped on at home or in a hotel room." (Ex. 32 Doc. 99-33 at ¶¶ 6, 11). Given Site 2020's conduct, Hollenback has reasonably lost confidence that any confidential information conveyed to Site 2020 during the course of this litigation will remain confidential. (Ex. 18 Doc. 101-15 at 52 [200:1-8], 62 [238:20-239:14], 66-67 [256:24-257:10, 258:7-11]; Ex. 32 Doc. 99-33 at ¶ 11).

In an apparent attempt to minimize the impact of its misconduct, Site 2020 asserts that Superior Traffic did not provide any confidential or proprietary business information during the product demonstration, and so everything discussed during the meeting either has been, or could have been, obtained through the normal course of discovery. Even assuming Site 2020 is correct that all of the information provided during the meeting would have been discoverable, Superior Traffic's interest in being represented by counsel during the discovery process while discussing such information with a party opponent was materially and substantially prejudiced. Thus, to the extent Site 2020 asserts Superior Traffic has not been prejudiced because much of the information it obtained during the meeting would have been produced during discovery, the Court disagrees. See *Xyngular*, 200 F.Supp.3d at 1321 (rejecting essentially the same argument and finding prejudice based on the plaintiff's "unauthorized possession and possible use of" information that was wrongfully obtained).

Likewise, to the extent Site 2020 argues Superior Traffic has not suffered any prejudice  as a result of Site 2020's misconduct because Site 2020 has not used, and will not use, any of the information it obtained during the meeting to supports its claims, the Court is not persuaded. Other district courts have rejected such a "no harm, no foul" approach to assessing prejudice and the propriety of granting terminating sanctions. In *American Rena International Corp. v. Sis-Joyce*

*International Co., Ltd.,* 2015 WL 12732433, at *28 (C.D. Cal. Dec. 14, 2015), for

example, the defendants argued their conduct in filing fraudulent declarations had

not caused any prejudice to the plaintiffs because the "declarations were not

actually relied on by the courts and [were] therefore inconsequential." The court

rejected the defendants' "no harm, no foul" argument, finding that the defendants'

position exhibited "disrespect for the legal process." *American Rena*, 2015 WL

12732433, at *29.

Under the circumstances, the Court finds the fact that Site 2020 has not used,

and claims it will not use, any evidence obtained during the December 2021

product demonstration in this litigation does not mean there has been no prejudice

to Superior Traffic. To the contrary, and for the reasons discussed, the Court finds

Superior Traffic has been substantially prejudiced by Site 2020's conduct, which

has fundamentally undermined the integrity of these proceedings and is utterly

inconsistent with the orderly administration of justice. See *Xyngular*, 200

F.Supp.3d at 1317 (recognizing there are "established rules of engagement and fair

play in lawsuits" and that failure to comply with these rules is an abuse of "the

judicial process and impugns the integrity of [judicial] proceedings.").

Finally, Site 2020 counters that there is no risk of prejudice to Superior

Traffic because it has legal recourse to address Site 2020's misconduct by asserting

tort counterclaims. This argument misses the mark. While Superior Traffic could

have merely sought leave of Court to assert tort counterclaims as a sole remedy for
Site 2020's litigation misconduct, it was not required to do so. Instead, Superior
Traffic has permissibly chosen to pursue case terminating sanctions to redress the
prejudice it has suffered as a result of Site 2020's conduct.

For the reasons stated above, the Court finds that Superior Traffic has been
substantially prejudiced by Site 2020's bad faith litigation misconduct. This factor
thus weighs heavily in favor of a case terminating sanction.

    b.  <u>Availability of Lesser Sanctions</u>

The final factor, the availability of less drastic sanctions, requires the Court
to consider "the feasibility of less drastic sanctions" and, if terminating sanctions
are granted, explain why alternative sanctions would not be effective. *Leon*, 464
F.3d at 960.

Superior Traffic's request for sanctions is twofold. It asks the Court to (1)
dismiss Site 2020's claims with prejudice; and (2) enter default judgment against
Site 2020 on Superior Traffic's proposed Third Amended Counterclaims. (Doc.
98).

Assuming, as the Court has decided, that sanctions are warranted, Site 2020
argues the sanctions requested by Superior Traffic are too severe, and asserts there
are less drastic sanctions available that would remedy any harm resulting from its
conduct. In addition to possible monetary sanctions or possible adverse inference

instruction, Site 2020 proposes several lesser sanctions it contends would be sufficient:

(1)     An express warning or explicit order from the Court regarding the conduct alleged in Superior Traffic's motion;

(2)     Expansion of written discovery limitations to allow Superior Traffic to adequately investigate and pursue any potential legal claims it believes arise as a result of the conduct alleged in its motion;

(3)     An order granting Superior Traffic leave to amend its operative pleadings to include additional allegations and/or assert additional counterclaims in connections with the December 8, 2021 demonstration;

(4)     Expansion of the number of depositions available to Superior Traffic in connection with this litigation such that the depositions of Thompson and Graham do not impact Superior Traffic's ability to pursue depositions of others in support of its defenses and counterclaims;

(5)     An order from the Court that no information disclosed during the December 8, 2021 demonstration be used in any way by Site 2020 to support or deny a claim in this case – unless such information is otherwise learned through the course of discovery.

(Doc. 108, at 40-41).

The Court disagrees with Site 2020 that the above proposed sanctions, either standing alone or in combination, would provide an adequate remedy for the harm caused by its serious litigation misconduct. As discussed at length above, Site 2020 acted willfully and in bad faith, circumvented the rules of discovery, and deprived Superior Traffic of its right to counsel. In doing so, Site 2020 obtained information

that is directly relevant to the merits of its patent infringement claims against

Superior Traffic.

The lesser sanctions proposed by Site 2020 would not be sufficient to

remedy the prejudice that Superior Traffic has suffered as a result of this

misconduct. Nor would such sanctions be sufficient to adequately deter future

litigants from similar misconduct, and to protect the public's interest in fair judicial

proceedings. *Xyngular*, 200 F.Supp.3d at 1325 (finding "[a]ny lesser sanction than

dismissal [] would be an open invitation to abuse the judicial process because

litigants would infer they have everything to gain and nothing to lose by trying to

lie, cheat, and abuse the orderly rules of discovery."  See also *Lee v. Trees, Inc.*,

2017 WL 5147146, 2017 WL 5147146, at *8 (D. Ore. Nov. 6, 2017) (finding

terminating sanctions appropriate "because any lesser sanction would suggest to

future litigants that they may manufacture evidence and suffer no meaningful

consequences if caught, because they would still be able to maintain a claim or

defense against the opposing party – a message equivalent to the 'no harm, no foul'

adage. Such an outcome would do nothing to dissuade such conduct in the

future.").

The primary case Site 2020 cites to support its argument that terminating

sanctions would be too drastic a remedy under the circumstances is inapposite.

(Doc. 108 at 37-38, citing *Phocene Sous-Marine, S.A. v. U.S Phosomarine, Inc.*,

682 F.2d 802 (9th Cir. 1982)). In *Phocene*, the defendant willfully deceived the court as to his availability for trial. *Phocene*, 682 F.2d at 804-805. The Ninth Circuit reversed the district court's decision to impose default judgment as a sanction under its inherent power because the "deception related not to the merits of the controversy but rather to a peripheral matter: whether [the defendant] was in fact too ill to attend trial." *Phocene,* 682 F.2d at 806. The Ninth Circuit held that "entry of default as a sanction for a deception of the court on a matter wholly unrelated to the merits of the controversy is inconsistent with the requirements of due process." *Phocene*, 682 F.2d at 806.

Here, unlike *Phocene*, Site 2020 obtained information that is directly relevant to the merits of its patent infringement claims against Superior Traffic. Given the nature of Site 2020's misconduct and its relationship to the merits of the controversy, the Court finds the reasoning in *Xyngular*, which is the primary case relied on by Superior Traffic to support its position that dispositive sanctions are warranted is far more persuasive.

Because Site 2020 has "deliberately engaged in deceptive practices that undermine the integrity of [these] judicial proceedings" and has "engaged in conduct utterly inconsistent with the orderly administration of justice," the Court finds that terminating sanctions as to Site 2020's patent infringement claims against Superior Traffic are appropriate. *Leon*, 464 F.3d at 958. See also *Anheuser-*

*Busch,* 69 F.3d at 348 (quoting *Wyle*, 709 F.2d at 591) ("It is well settled that dismissal is warranted where … a party has engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings: 'courts have inherent power to dismiss an action when a party has willfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice'.").

In addition to dismissal of Site 2020's claims, Superior Traffic requests sanctions in form of a default judgment on all 17 of its counterclaims, which include the following: (1) declaratory judgment of non-infringement of U.S. Patent No. 10,249,186 ("the '186 Patent"); (2) declaratory judgment of non-infringement of U.S. Patent No. 11,055,993 ("the '993 Patent"); (3) declaratory judgment of invalidity of the '186 Patent; (4) declaratory judgment of invalidity of the '993 Patent; (5) declaratory judgment of unenforceability of the '186 Patent; (6) declaratory judgment of unenforceability of the '993 Patent; (7) false advertising and unfair competition under 15 U.S.C. § 1125(A)(1)(B); (8) false advertising under Mont. Code Ann. § 30-14-101 *et seq.*; (9) injurious falsehood; (10) tortious interference with business expectancies; (11) unfair competition under Mont. Code Ann. § 30-14-101 *et seq.*; (12) unfair competition under Montana common law; (13) unfair restriction on trade under Sherman Act § 1, 15 U.S.C. § 1 *et seq.*; (14) attempted monopolization under Sherman Act § 2, 15 U.S.C. § 2 *et seq.*; (15)

unlawful contract under Clayton Act § 3, 15 U.S.C. § 14 *et seq*.; (16) unjust

enrichment under Montana common law and Mont. Code Ann. § 27-1-602; and

(17) infringement of the '817 Patent. (Second Amended Counterclaims, Doc. 47 at

57-72; proposed Third Amended Counterclaims, Doc. 80-1 at 59-74).

Superior Traffic asks the Court to enter default judgment in its favor and

against Site 2020 on all 17 counterclaims. Superior Traffic proposes three

alternatives in descending order of preference: (a) a default judgment establishing a

presumption of truth as to the allegations of its counterclaims, leaving only the

issue of remedies on the counterclaims to be established at an evidentiary hearing,

including any related briefing; (b) or as a less preferred alternative, a default

judgment after an evidentiary hearing (including any related briefing) at which

Superior Traffic may present its prima facie case on liability and its entitlement to

remedies; (c) or, as an even less preferred alternative, a default judgment that

Superior Traffic has established its prima facie case that Site 2020 is liable on its

counterclaims, leaving Site 2020 to disprove liability. (Doc. 98 at 2-3).

Having considered Superior Traffic's proposals, the Court finds that entering

judgment on any of Superior Traffic's counterclaims is too severe of a sanction

under the circumstances. The prejudice Superior Traffic has suffered as result of

Site 2020's conduct will be adequately remedied by dismissing Site 2020's patent

infringement claims, leaving Superior Traffic to litigate its counterclaims against Site 2020 if it chooses to do so.

As discussed above, the Court has determined that Site 2020 willfully engaged in conduct that is utterly inconsistent with administration of justice. The Court also recognizes that in doing so, Site 2020 has undermined the integrity of the litigation process, including Superior Traffic's confidence in the federal judicial system. If Site 2020's claims against Superior Traffic are not dismissed, Superior Traffic will be in the untenable position of having to defend itself against patent infringement claims asserted by a party opponent who has not litigated those claims in good faith. The prejudice that Superior Traffic would suffer if it were put in such a position can be adequately remedied by dismissing Site 2020's claims, thereby putting Superior Traffic purely in the position of a plaintiff as to its counterclaims. As the plaintiff, Superior Traffic can choose whether to continue litigating some or all of its claims against Site 2020.

For these reasons, the Court finds that dismissing Site 2020's claims but declining to enter any form of default judgment on Superior Traffic's counterclaims is the least onerous effective sanction that can be imposed under the circumstances. See *Renner v. Takeda v. Pharmaceuticals U.S.A. Inc.*, 2017 WL 120852, at *5 (D. Mont. Jan. 12, 2017) (recognizing that imposing the "least

onerous effective sanction" is reflective of the court's obligation "to exercise its inherent powers with restraint and discretion.").

In sum, the public's interest in expeditious resolution of litigation, the Court's need to manage its docket, the prejudice to Superior Traffic, and the unavailability of less drastic sanctions all weigh in favor of dismissing Site 2020's claims as a sanction for its litigation misconduct. Although the public policy favoring disposition of cases on their merits weighs against dismissal – as it always does – this factor is heavily outweighed by the other four.

## III.  Motion for Leave to File Third Amended Counterclaims

### A.  Background

Superior Traffic's original and First Amended Counterclaims, filed in June 2021 and August 2021, respectively, did not include any counterclaims for patent infringement. (Docs. 15 and 30). In September 2021, Superior Traffic sought and obtained leave under Federal Rule of Civil Procedure 15(a) to file Second Amended Counterclaims to add a patent infringement counterclaim against Site 2020. (Doc. 44; Doc. 46). As pled in its Second Amended Counterclaims, Superior Traffic's patent infringement counterclaim accuses Site 2020's portable traffic light product, the Guardian PTL of infringing the '817 Patent. (Doc. 47, at 71 ¶ 137).

In mid-April 2022, approximately two weeks after the Court recommended denying Site 2020's subsequent Rule 12(b)(6) motion to dismiss Superior Traffic's patent infringement counterclaim (Doc. 72), Superior Traffic filed the pending motion for leave to file Third Amended Counterclaims. (Doc. 78). Superior Traffic asserts that when it filed its motion to amend in April 2022, it had only recently learned that Site 2020's Guardian PTL was never commercialized. Superior Traffic therefore seeks leave to amend its patent infringement counterclaim to instead identify Site 2020's flagship traffic management system – the Guardian SmartFlagger – as the accused product.

Superior Traffic also seeks to include new factual allegations regarding Site 2020's business operations and allegedly deceptive trade practices. (Doc. 80-2 at 52 ¶ 105-112).

### B.    Legal Standard

Federal Rule of Civil Procedure 15(a) provides that leave to amend a pleading "shall be freely given when justice so requires." As interpreted by the Ninth Circuit, Rule 15(a) creates a liberal policy in favor of granting leave to amend. See *Ascon Properties, Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1160 (9th Cir. 1989); *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003). Whether to grant leave to amend is left to the court's discretion. *Ditto v. McCurdy*, 510 F.3d 1070, 1079 (9th Cir. 2007).  In determining whether to grant

leave to amend, the Ninth Circuit instructs courts to consider the following factors:
(1) bad faith; (2) undue delay; (3) prejudice to the opposing party; (4) futility of
amendment; and (5) whether the plaintiff has previously amended the complaint.
*U.S. v. Corinthian Colleges*, 655 F.3d 984, 995 (9th Cir. 2011).  Of these five
factors, it is "the consideration of prejudice to the opposing party that carries the
greatest weight." *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th
Cir. 2003). Absent prejudice, or a strong showing of any of the remaining factors,
there is a presumption "in favor of granting leave to amend." *Eminence Capital*,
316 F.3d at 1052.

    If a party seeks leave to file an amended pleading after the deadline
established by the scheduling order has passed, however, Rule 16(b) provides the
controlling standard. *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1294 (9th Cir.
2000); *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 607-08 (9th Cir.
1992). Rule 16(b) requires that a party show good cause for amending the
scheduling order to allow the filing of an amended pleading.  *Coleman*, 232 F.3d at
1294. "Unlike Rule 15(a)'s liberal amendment policy which focuses on the bad
faith of the party seeking to interpose an amendment and the prejudice to the
opposing party, Rule 16(b)'s 'good cause' standard primarily considers the
diligence of the party seeking the amendment...." *Johnson*, 975 F.2d at 607.

## C.    Discussion

The parties disagree on the threshold issue of what standard the Court should apply to determine whether Superior Traffic should be granted leave file its Third Amended Counterclaims. Superior Traffic argues the liberal standard for amendment set forth in Rule 15(a) should apply, while Site 2020 takes the position that Superior Traffic should be held to a more stringent "good cause" standard for amending its counterclaims.

The scheduling order that was in place at the time Superior Traffic filed this motion did not establish a deadline for amending the pleadings as required to trigger a "good cause" analysis under Rule 16. (Doc. 40).  Given that there was no court-ordered deadline for amending the pleadings, Site 2020 does not argue for application of Rule 16. Instead, Site 2020 cites several patent infringement cases applying a heightened "good cause" standard for amending infringement contentions and asks the Court to apply that standard here. (Doc. 81, at 18). Like the "good cause" inquiry under Rule 16, the standard applied in the cases cited by Site 2020 considers the diligence of the party seeking leave to amend its infringement contentions. See *Philips N. Am. LLC v. Fitbit* LLC, 2021 WL 5417103, at *3 (D. Mass. Nov. 19, 2021); *Abbott Diabetes Care Inc. v. Roche Diagnostics Corp.*, 2007 WL 2221029, at *1 (N.D. Cal. July 30, 2007); *GoPro, Inc. v. 360Heros, Inc.*, 2017 WL 1278756, at *2 (N.D. Cal. Apr. 6, 2017); *Angioscore, Inc. v. TriReme Med., Inc.*, 2015 WL 75187, at *5 (N.D. Cal. Jan. 6,

2015); *Thermapure, Inc. v. Giertsen Co. of* Illinois, 2012 WL 6196912, at *4 (N.D. Ill. Dec. 11, 2012); *Icon-IP Pty Ltd. v. Specialized Bicycle Components, Inc.*, 2014 WL 4773960, at *2 (N.D. Cal. Sept. 19, 2014)).

Superior Traffic argues these cases are inapposite, however, because they are from districts with local patent rules that allow amendment of infringement contentions only upon a showing of good cause. This is a valid and material distinction. In each case cited above, the court denied a motion to supplement or amend infringement contentions, and in doing so applied local district court patent rules requiring the moving party to show good cause. Unlike the districts in those cases, the District of Montana has not adopted a comprehensive set of local patent rules to guide the Court's inquiry. Notably, the pretrial scheduling order that was in place when Superior Traffic filed its motion to amend in mid-April 2022 did not establish a deadline for amending the pleadings. (Doc. 40). That order has since been vacated, and there is no pretrial schedule currently in place.

Because no court ordered deadline for amending the pleadings was ever set, Rule 16 does not apply. But even if it did, Superior Traffic has demonstrated good cause for allowing it to file its proposed Third Amended Counterclaims.

1.    <u>Good Cause</u>

Whether derived from Rule 16 or the patent cases cited by Site 2020, a heightened good cause standard for amending the pleadings focuses on the

diligence of the party seeking leave to amend. See e.g. *Johnson*, 975 (discussing Rule 16's good cause standard); *Philips*, 2021 WL 5417103, at \*3 (discussing the good cause standard embodied in the federal district court's local patent rules).

Site 2020 argues Superior Traffic was not diligent in seeking leave to amend because it has known of the Guardian SmartFlagger product since this litigation first began in May 2021, but did not seek to accuse the Guardian SmartFlagger of infringement until nearly a year later, in April 2022 – approximately two months before fact discovery was set to close and after *Markman* briefing was complete.[8] Superior Traffic does not dispute that it was aware of the Guardian SmartFlagger when it first asserted its patent infringement counterclaim in September 2021, but claims it was not aware of information in the public domain at that time suggesting that the Guardian SmartFlagger could be integrated into a remotely-operated network watcher traffic system and was therefore infringing on the '817 Patent.

 Superior Traffic explains that in mid-August 2021, Site 2020 posted a video to Facebook introducing its newest product, the Guardian PTL. Hollohan discussed the Guardian PTL's expected features during the video, and several days later he appeared on a local news show where he further explained that the Guardian PTL

---

[8] Pursuant to the Scheduling Order in place when Superior Traffic filed its motion for leave to amend on April 14, 2022, fact discovery was set to close on June 24, 2022, expert discovery was set to close on September 16, 2022, and trial was set for March 13, 2023. (Doc. 40).

would be capable of being operated by, and communicating with, a centralized traffic management system that is remote from a worksite. (Doc. 47 at ¶¶ 58-60). Based on that publicly available information, Superior Traffic had a reasonable basis for believing that the Guardian PTL infringed certain claims of the '817 Patent, and therefore identified the Guardian PTL as the accused product when it filed its Second Amended Counterclaims on September 15, 2021. (Doc. 80-3 at ¶¶ 2-3).

Superior Traffic served Site 2020 with its first set of discovery requests on September 17, 2021, and a second set of discovery requests on November 26, 2021. (Doc. 80-3 at ¶¶ 5, 6). In both sets of discovery requests, Superior Traffic asked Site 2020 to produce documents and information that would permit it to identify each Site 2020 accused product. (Doc. 80-3 at ¶¶ 5-6). To preserve its ability to pursue claims against all infringing Site 2020 products, Superior Traffic broadly defined the accused systems in its October 2021 preliminary infringement contentions as including the Guardian PTL "and/or the Guardian SmartFlagger." (Doc. 80-4, at 5-6). On December 7, 2021, Site 2020 produced documents relating to the Guardian SmartFlagger for the first time. (Doc. 80-3 at ¶ 7).

Approximately one month later, on January 6, 2022, Site 2020 stated in response to a Superior Traffic interrogatory that its Guardian PTL "is presently in in a prototyping phase of development and … has not been manufactured,

imported, or sold in the United States" and therefore cannot infringe the '817

Patent. (Doc. 80-5 at 54). Superior Traffic served deposition notices on Romkey

and Hollohan a few days later, and took their depositions during the first week of

March 2022. (Doc. 8-3 at ¶¶ 9, 11). During his deposition on March 7, 2022,

Hollohan confirmed that the Guardian SmartFlagger communicates with a Site

2020 "network operations center" to monitor multiple worksites. (Doc. 80-6 at 25-

26 [261:23-264:18]). Until that time, Superior Traffic contends, it did not have a

firm basis for asserting that the Guardian SmartFlagger was infringing on its '817

Patent. (Doc. 87 at 16).

Site 2020 counters that Hollohan's deposition did not reveal any information

about the functionality or operation of the Guardian SmartFlagger that was not

available in public materials on Site 2020's website or the documents provided by

Site 2020 in December 2021. (Doc. 81 at 19). Site 2020 thus stands by its position

that Superior Traffic was not diligent in attempting to identify the allegedly

infringing product and should not be permitted to file its Third Amended

Counterclaims.

Notwithstanding Site 2020's arguments to the contrary, the Court finds that

Superior Traffic has demonstrated it diligently pursued discovery and did not

unduly delay in seeking leave to amend. Site 2020 does not identify what

information on its website would have alerted Superior Traffic that the Guardian

SmartFlagger has the specific features it asserts are infringing on the '817 Patent. Even assuming Superior Traffic could have identified the Guardian SiteFlagger's allegedly infringing features based on the documents Site 2020 produced in December 2021, it did not unduly delay in waiting until April 2022 to seek leave amend, particularly given that it diligently sought to depose Hollohan in the interim and it was Hollohan's deposition testimony that confirmed the Guardian SmartFlagger has the allegedly infringing features. The Court also notes that, pursuant to the scheduling order in place when Superior Traffic filed its motion to amend in April 2022, fact discovery was not set to close for two months, the expert discovery deadline was still five months away, and trial was scheduled for March 2023. (Doc. 40).

For these reasons, the Court finds that Superior Traffic has demonstrated good cause for permitting it to file its Third Amended Counterclaims, and next considers whether leave to amend is appropriate under Rule 15.

2.   <u>Amendment Under Rule 15</u>

a.   *Prejudice*

Superior Traffic argues Site 2020 will not be prejudiced if it is allowed to file its Third Amended Counterclaims because Site 2020 has been on notice since the disclosure of preliminary infringement contentions in October 2021 that the Guardian SmartFlagger is at issue in the litigation. As indicated above, Superior

Traffic broadly defined the accused systems in its October 7, 2021, preliminary infringement contentions as including the Guardian PTL "and/or the Guardian SmartFlagger." (Doc. 80-4, at 5-6). See *ParkerVision, Inc. v. Qualcomm Inc.* 2015 WL 4751354, at *3 (M.D. Fla. Aug. 11, 2015 ("The purpose of infringement contentions is to provide the [accused infringer] with notice of the [patentee's] theories of infringement beyond what is disclosed in the complaint."); *Beijin Choice Elec. Tech. Co. v. Contec Med. Sys. USA Inc.*, 2020 WL 1701861, at *12 (N.D. Ill. Apr. 8, 2020) (recognizing "that the accused products a patentee identifies in its complaint do not necessarily control a case because the patentee later identifies the accused products at issue as part of its Initial and Final Infringement Contentions.").

In addition, since disclosing its preliminary infringement contentions, Superior Traffic has sought and obtained discovery relating to Site 2020's Guardian SmartFlagger products. Specifically, Superior Traffic served several interrogatories and requests for production seeking information relating either to a "Site 2020 Patented Product," commercial embodiments of the Site 2020 Patents-in-Suit, or a "Site 2020 Accused Product." (See Doc. 87-1 Interrogatory No. 5; Doc. 87-2 Interrogatory Nos. 10, 15, and 17; Doc. 87-3 Request Nos. 9, 14, 16-18; Doc. 87-4 Request Nos. 24, 36, 37, 44-57, 62, 65, 67, 68, 71, 72, 77, 82, 84, 90, 95-97, 101, and 103). Superior Traffic's discovery requests define a "Site 2020

Patented Product" to include any product "that Site 2020 contends is an embodiment of any claims of the Site 2020 Patents-In-Suit and/or a Site 2020 Related Patent." (Doc. 87-2 at 6; Doc. 87-3, at 5; Doc. 87-4, at 6). Because Site 2020 contends that the Guardian SmartFlagger is an embodiment of the Site 2020 Patents-In-Suit (Doc. 87-1 at 18), it meets the definition of a Site 2020 Patented Product. The Guardian SmartFlagger can also be considered a "Site 2020 Accused Product," which Superior Traffic defines in its discovery requests to mean "any Site 2020 products that Superior identified in its Counterclaims, Amended Counterclaims, infringement contentions, and any additional products that are not colorably different from those products." (Doc. 87-2 at 6; Doc. 87-3, at 5; Doc. 87-4, at 6). As pointed out above, Site 2020 produced documents relating to the Guardian SmartFlagger on December 7, 2021. (Doc. 80-3 at ¶ 7). The record thus reflects that Site 2020 has long been on notice that the Guardian SmartFlagger is at least potentially at issue in the case. See *Mlc Intellectual Property, LLC v. Micron Technology, Inc.*, 2019 WL 978766, at *4 (N.D. Cal. Feb. 28, 2019) (finding no prejudice in permitting plaintiff to amend infringement contentions where discovery relating to the additional products had been taken)

Site 2020 nevertheless asserts it will be unduly prejudiced if Superior Traffic is permitted to amend its counterclaims to accuse a different product of infringement because it will not have sufficient time to conduct additional

discovery focusing on Superior Traffic's new claims. When Superior Traffic filed

its motion to amend in April 2022, fact discovery was set to close two months later

– in June 2022. (Doc. 40).  As explained above, however, the pretrial scheduling

order was vacated in May 2022 and there is no pretrial schedule presently in place.

Site 2020 further argues that Superior Traffic's proposed amended

infringement counterclaims will likely raise new claim construction disagreements,

and points out that claim construction discovery closed more than three months

before Superior Traffic sought leave to amend. Therefore, if Superior Traffic is

permitted to amend its infringement counterclaims to accuse the Guardian

SmartFlagger, Site 2020 asks that it be allowed to present the Court with any

additional claim construction disputes that arise directly from the amendment.

Specifically, Site 2020 requests (1) "the opportunity to submit a short supplemental

claim construction brief regarding terms of the '817 Patent that now appear to be in

dispute" and (2) "that fact discovery (and subsequent calendar dates) be extended

by 90 days" to allow it adequate time to prepare its defenses prior to the end of

discovery. Although Superior Traffic opposes both of these requests, the Court

finds they are reasonable under circumstances, particularly in light of the fact that

there is no pretrial schedule currently in place.

Finally, to the extent Site 2020 argues its Guardian SmartFlagger has

fundamentally different features, functionality, and operation than the Guardian

PTL, it does not identify or explain what those differences are. Regardless, any potential prejudice to Site 2020 as a result of allowing Superior Traffic to amend its infringement counterclaims can be alleviated by permitting supplemental claim construction briefing if necessary and providing sufficient time for Site 2020 to conduct any necessary additional discovery.

        b.     *Undue Delay, Bad Faith, Futility, and Prior Amendments*

The remaining Rule 15 factors also weigh in favor of granting Superior Traffic leave to amend. As discussed above in finding good cause, Superior Traffic did not unduly delay in seeking to assert its Third Amended Counterclaims. Site 2020 does not argue that Superior Traffic has acted in bad faith in seeking leave to amend, and the Court finds no evidence of bad faith. Nor does Site 2020 argue that Superior Traffic's proposed Third Amended Counterclaims are futile. Taking the allegations in the Third Amended Counterclaims as true, Superior Traffic's proposed patent infringement counterclaims state a claim for relief. See *Sleekez, LLC v. Horton*, 2017 WL 1906957, at *4 D. Mont. April 21, 2017) (citing *Miller v. Rykoff-Sexton, Inc*., 845 F.2d 209, 214 (9th Cir. 1988) (futility is analyzed under the same standard that applies to a Rule 12(b)(6) motion to dismiss). Although Superior Traffic has previously amended its counterclaims, as discussed above it did not have all of the information necessary to accuse the Guardian SmartFlagger at the time of the prior amendments.

### 3. Additional Factual Allegations

Superior Traffic also seeks leave to amend its counterclaims to include new factual allegations regarding Site 2020's business operations and allegedly deceptive trade practices. (Doc. 80-2 at 52 ¶ 105-112).

At the time Site 2020 filed its response in April 2022, it did not oppose permitting Superior Traffic to amend its counterclaims to include these new factual allegations. (Doc. 81, at 23). The factual allegations in paragraphs 105 through 111 of Superior Traffic's proposed pleading relate to Site 2020's alleged false and misleading advertising, and do not implicate the conduct that forms the basis of Superior Traffic's motion for sanctions. Superior Traffic should therefore be allowed to include paragraphs 105 through 111 in its Third Amended Counterclaims.

Superior Traffic also seeks to add details relating to Site 2020's ownership and control of Southwest Safety "that deceived Superior into providing an hours-long product demonstration while this case was pending." (Doc. 80 at 9). In particular, Superior Traffic proposes adding the following paragraph:

> 112.   In December 2021, through Southwest Safety, Site 2020 induced Superior to make a commercial "pitch" about supplying AFAD products and services to Southwest Safety. During the demonstration, which last more than three hours, Southwest Safety asked for and received detailed information from Site 2020 regarding Site 2020's products, services, and future plans, and also inspected and photographed the AFAD units Superior had supplied. Neither Site 2020 nor Southwest Safety disclosed to Superior at any time that Site 2020 owned and controlled Southwest Safety, meaning

> that the pretext on which the demonstration was set was false and fraudulent, and that all information received by Site 2020 through that demonstration was obtained by subterfuge and denying Superior the protections of the discovery rules as well as the benefit of counsel.

(Doc. 80-2 at 53). Superior Traffic's motion for sanctions is based in large part on the conduct alleged in paragraph 112. Because the sanctions recommended above will provide a remedy for the prejudice suffered by Superior Traffic as a result of this conduct, Superior Traffic should not be permitted to also pursue tort remedies based on the same conduct. Accordingly, Superior Traffic's motion for leave file Third Amended Counterclaims should be denied as to paragraph 112, but granted in all other respects.

## IV.   <u>Conclusion</u>

For the reasons discussed above,

IT IS RECOMMENDED that Superior Traffic's Motion for Sanctions (Doc. 98) be GRANTED IN PART and DENIED IN PART. The Court should dismiss Site 2020's patent infringement claims against Superior Traffic, as set forth in Counts 1 and 2 of the First Amended Complaint (Doc. 29) with prejudice, but should decline to enter default against Site 2020 on any of Superior Traffic's Third Amended Counterclaims. Site 2020 should also be required to pay Superior Traffic's reasonable attorneys' fees and costs incurred in filing and litigating its motion for sanctions.

IT IS FURTHER RECOMMENDED that Superior Traffic's Motion for Leave to File Third Amended Counterclaims (Doc. 78) should be DENIED to the extent it seeks to include factual allegations relating to conduct by Site 2020 that is basis for Superior Traffic's motion for sanctions, but GRANTED in all other respects.

After presiding United States District Judge Christensen has reviewed this Findings and Recommendation and ruled on Superior Traffic's motions, the Court will set a scheduling conference to establish a pretrial schedule to govern any claims that remain in the case.

NOW, THEREFORE, IT IS ORDERED that the Clerk shall serve a copy of the Findings and Recommendation of the United States Magistrate Judge upon the parties. The parties are advised that pursuant to 28 U.S.C. § 636, any objections to the findings and recommendations must be filed with the Clerk of Court and copies served on opposing counsel within fourteen (14) days after entry hereof, or objection is waived.

DATED this 27th day of March, 2023.

Kathleen L. DeSoto
United States Magistrate Judge

# EXHIBIT 5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
SPENCER MEYER, individually and on      :
behalf of those similarly situated,     :
                                        :        15 Civ. 9796
        Plaintiffs,                     :
                                        :              ORDER
        -v-                             :
                                        :
TRAVIS KALANICK,                        :
                                        :
        Defendant.                      :
------------------------------------x

JED S. RAKOFF, U.S.D.J.

        Pursuant to the Court's directions at an in-court hearing

held earlier today (May 27, 2016), the Court hereby narrows the

scope of document subpoenas served by plaintiff on Uber

Technologies, Inc. and Global Precision Research, LLC D/B/A

Ergo, as indicated on the marked-up copies of those subpoenas,

which will be docketed along with this Order. In addition, the

Court narrows the time frame of these document requests to

December 2015 through May 18, 2016.

SO ORDERED.


Dated:   New York, NY
         May 27, 2016                    JED S. RAKOFF, U.S.D.J.

1

Original

AO 88B (Rev. 12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of New York

| | |
|---|---|
| SPENCER MEYER | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. 15-cv-9796 (JSR) |
| TRAVIS KALANICK | ) |
| | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:      UBER TECHNOLOGIES, INC
633 W. 27th St., 3d Fl., New York, New York 10001

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: SEE ATTACHED RIDER

| Place: Via email to jwadsworth@hselaw.com, as per agreement | Date and Time: |
|---|---|
| | 05/27/2016 12:00 pm |

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:      05/24/2016

*CLERK OF COURT*

OR _____
*Signature of Clerk or Deputy Clerk*                    *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*      PLAINTIFF
SPENCER MEYER                                                                , who issues or requests this subpoena, are:

Jeff Wadsworth, Harter Secrest & Emery LLP, Rochester, New York 14604, jwadsworth@hselaw.com, 585-231-1200

## Notice to the person who issues or requests this subpoena
A notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B (Rev. 12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 15-cv-9796 (JSR)

## PROOF OF SERVICE

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)*

on *(date)* .

❐ I served the subpoena by delivering a copy to the named person as follows:

on *(date)* ; or

❐ I returned the subpoena unexecuted because:

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ .

My fees are $              for travel and $              for services, for a total of $      0.00      .

I declare under penalty of perjury that this information is true.

Date:

*Server's signature*

*Printed name and title*

*Server's address*

Additional information regarding attempted service, etc.:

AO 88B (Rev. 12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2) *For Other Discovery.*** A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) *Command to Produce Materials or Permit Inspection.***
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) *Quashing or Modifying a Subpoena.***
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) *Claiming Privilege or Protection.***
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SPENCER MEYER, individually and on behalf of
those similarly situated,

               Plaintiffs,

          vs.

TRAVIS KALANICK,

               Defendant

1:15 Civ. 9796 (JSR)

---

## RIDER TO SUBPOENA DUCES TECUM
## TO UBER TECHNOLOGIES, INC., DATED MAY 24, 2016

Pursuant to Federal Rule of Civil Procedure 45, Plaintiff causes the attached subpoena to be served on Uber Technologies, Inc. ("Uber") commanding the production of all of the documents and other tangible things specified in the subpoena that are in Uber's possession, custody, or control. All documents and tangible things responsive to the attached subpoena should be produced **by Friday, May 27, 2016**. Uber's responses shall be served via electronic mail to the undersigned as agreed to by the parties.

### INSTRUCTIONS

1.      The request shall be construed to include any additional documents responsive to these requests that are discovered or produced after the date of production, and therefore require further and supplemental responses.

2.      The request extends to any and all documents in your possession, custody, or control regardless of the physical location of the documents, or whether such documents are possessed by You, Your Employees, attorneys, agents, representatives, or investigators.

1

3.      All documents should be produced as they are kept in the usual course of business or shall be organized and labeled to correspond to the categories in the request. All documents should be produced in the order in which they appear in the files of the custodian, and should contain a clear indication of where each document ends and the next begins. Documents maintained in a file folder or binder should be preceded by the file folder or binder label, if one exists, and should contain a clear indication of where the file folder or binder begins and ends. All attachments to a document should be produced with the document. A unique control number should be affixed to each page (or, to each document, where a native file is produced). Computer files and other documents maintained in electronic form should be produced in machine readable electronic form. The source and location of each responsive document should be designated, including the entity or person from which or whom it was obtained.

4.      Your search for Documents should include a search for all types of mobile messages and electronic mail on the mobile devices (smartphones or tablets or similar devices) that were and are used by Salle Yoo, Joe Sullivan and Craig Clark in connection with the subject matter set forth in this subpoena.

5.      If you object to any of the categories of documents set forth below, you must fully set forth your objections in writing. If objection is made to part of any document or category, the part should be specified. If you object to any request or part of any request, you must produce all documents to which your objection does not apply.

6.      If you assert that documents responsive to this subpoena are not discoverable based upon some privilege, provide a written log that identifies: (i) the nature of the privilege (including work product) which is being claimed and, if the privilege is governed by state law, indicate the state's privilege rule being invoked; (ii) the type of document, e.g., letter or

2

memorandum that is being withheld; (iii) the general subject matter of the document; (iv) the date of the document; and (v) the author of the document, the addressees of the document, and any other recipients, and, where not apparent, the relationship of the author, addressees, and recipients to each other.

7.      If any document that you are requested to produce or identify herein was at one time in existence, but has been lost, discarded, or destroyed, identify in writing each document and provide the following information: (a) the date or approximate date it was lost, discarded, or destroyed; (b) the circumstances and manner in which it was lost, discarded, or destroyed; (c) the reason or reasons for disposing of the document (if discarded or destroyed); (d) the identity of all persons authorizing the document and/or having knowledge of the document; (e) the identity of the person(s) who lost, discarded, or destroyed the document; (f) the identity of any persons having knowledge of the contents thereof; and (g) a detailed summary of the nature and contents of the document, including the author(s) of the document(s), the name of the person(s) to whom the document(s) was (were) delivered or addressed, including indicated or blind copy recipients, the date of the document(s), and a description of the subject matter thereof, including any attachment or appendices, and the number of pages.

8.      If any documents cannot be produced in full, you are requested to produce them to the fullest extent possible, specifying the reasons for your inability to produce the remainder and stating any information, knowledge, or belief you have concerning the unproduced portion.

9.      In the event that multiple copies of a document exist, produce every copy on which appear any notations or markings of any sort that do not appear on any other copy.

## DEFINITIONS

1.      "Plaintiff" refers to Spencer Meyer, the Plaintiff in this action.

3

2. "Defendant" refers to Travis Kalanick, the Defendant in this action, and anyone act-ing on Defendant's behalf, including but not limited to Boies Schiller & Flexner LLP.

3. "Uber," "You," and "Your," means and includes Uber Technologies, Inc. and each person or entity acting on its behalf, including but not limited to its parent and subsidiary compa-nies, predecessors-in-interest, successors-in-interest, affiliated entities, officers, directors, partners, associates, shareholders, agents, employees, servants, representatives, accountants, investigators, attorneys (including but not limited to Gibson Dunn), and Defendant.

4. "Ergo" means and includes Global Precision Research, LLC, doing business as Er-go, and each person or entity acting on its behalf, including but not limited to its parent and subsidi-ary companies, predecessors-in-interest, successors-in-interest, affiliated entities, officers, directors, partners, associates, shareholders, agents, employees, servants, representatives, accountants, investi-gators and attorneys. Ergo shall include Miguel E.H. Santos-Neves.

5. "Lawsuit" refers to *Spencer Meyer v. Travis Kalanick*, Civil Action No. 1:15 Civ. 9796 (JSR).

6. "Document" is defined to be synonymous in meaning and equal in scope to the us-age of the term "documents or electronically stored information" in Fed. R. Civ. P. 34(a)(1)(A) and shall include all types of instant messaging, or mobile messaging (including, e.g., imessages, text messages and their equivalents). A draft or non-identical copy is a separate document within the meaning of this term.

7. "Documents sufficient to identify" and "documents sufficient to show" mean docu-ments that are necessary and sufficient to provide the information requested. Where "documents sufficient to identify" and "documents sufficient to show" are requested, Uber may submit either responsive documents or an affidavit executed by Uber that contains the requested information,

identifies the specific source of the information, and which indicates that the statement is based on information contained in documents or records maintained in the ordinary course of business.

8.    "All" and "Any" shall be construed as encompassing any and all.

9.    The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the document request all responses that might otherwise be outside its scope.

10.    "Include" or "including" denotes a portion of a larger whole and is used without limitation.

11.    "Concerning" means relating to, referring to, describing, evidencing or constituting.

## DOCUMENTS REQUESTED

1.    All agreements between Uber and Ergo or any other consultant or company concerning or relating to any kind of investigation or background research concerning or relating to Plaintiff, Plaintiff's counsel, or this Lawsuit.

2.    All agreements between Defendant and Ergo or any other consultant or company concerning or relating to any kind of investigation or background research concerning or relating to Plaintiff, Plaintiff's counsel, or this Lawsuit.

3.    All agreements between Uber and Ergo or any other consultant or company concerning or relating to any kind of investigation or background research concerning or relating to any other party in any other litigation against Uber or Defendant.

4.    All agreements between Defendant and Ergo or any other consultant or company concerning or relating to any kind of investigation or background research concerning or relating to any other party in any other litigation against Uber or Defendant.

5

~~5.      All invoices and payment records relating to the retention of Ergo or any other consultant or company by Uber or Defendant relating to any kind of investigation or background research concerning or relating to Plaintiff or Plaintiff's counsel.~~

6.      All communications between Uber and Defendant concerning or relating to Ergo or any kind of investigation or background research concerning or relating to Plaintiff, Plaintiff's counsel~~, or any other party in any other litigation against Uber or Defendant~~.

7.      All documents concerning or relating to any kind of investigation or background research concerning or relating to Plaintiff or Plaintiff's counsel, including but not limited to:

    a.   All internal communications at Uber concerning or relating to any kind of investigation ~~or background research~~ concerning or relating to Plaintiff or Plaintiff's counsel.

    ~~b.   All communications between Uber and its parent and subsidiary companies, predecessors-in-interest, successors in-interest, affiliated entities, officers, directors, partners, associates, shareholders, agents, employees, servants, representatives, accountants, investigators, attorney, including but not limited to Gibson Dunn, concerning or relating to any kind of investigation or background research concerning or relating to Plaintiff or Plaintiff's counsel.~~

    c.   All communications between Uber and Defendant or Defendant's counsel concerning or relating to any kind of investigation or background research concerning or relating to Plaintiff or Plaintiff's counsel.

    d.   All communications between Defendant and anyone acting on Defendant's behalf, including but not limited to Boies Schiller & Flexner LLP, concerning or

6

relating to any kind of investigation or background research concerning or relating to Plaintiff or Plaintiff's counsel.

 e. All communications between Uber and Ergo concerning or relating to any kind of investigation or background research concerning or relating to Plaintiff or Plaintiff's counsel.

 f. All communications between Defendant and Ergo concerning or relating to any kind of investigation or background research concerning or relating to Plaintiff or Plaintiff's counsel.

 g. Any reports, summaries, or notes created in connection with any kind of investigation or background research concerning or relating to Plaintiff or Plaintiff's counsel.

 h. Any audio recordings, video recordings, or photographs obtained or created in connection with any kind of investigation or background research concerning or relating to Plaintiff or Plaintiff's counsel.

 i. All communications between Uber (including Defendant) and any other person or entity concerning or relating to any kind of investigation or background research concerning or relating to Plaintiff or Plaintiff's counsel.

~~8. All communications with Miguel E.H. Santos-Neves between December 15, 2016 and the present.~~

9. All documents reflecting or revealing the investigate tools or approaches (*e.g.,* spyware, vehicle surveillance, phone calls or emails to friends or family) employed by Ergo to obtain information relating to (a) Plaintiff, Plaintiff's counsel~~, or this Lawsuit; (b) any party in any other judicial proceeding; or (c) any other individual or entity investigated or researched by Ergo~~.

7

10.    All documents reflecting proposed statements or representations by Uber, Defendant, or Defendant's counsel to Plaintiff or his counsel relating to Ergo, including but not limited to the January 20, 2016 email communication between Defendant's counsel and Plaintiff's counsel.

11.    All documents reflecting proposed statements or representations by Uber, Defendant, or Defendant's counsel to Judge Rakoff or his clerk relating to Ergo, including but not limited to any proposed statements or representations that:

        a.    Defendant did not know any of the individuals at Uber who initiated the Ergo investigation;

        b.    Defendant had no involvement with the Ergo investigation, other than to demand that Ergo cease its investigation;

        c.    Defendant never obtained any information from Ergo relating to Ergo's investigation, other than the list of individuals contacted by Ergo, which Defendant first received on or about May 18, 2016; and

        d.    The list attached to the May 18, 2016, letter from Defendant's counsel to Plaintiff's counsel contains a complete list all communications between Ergo and individuals or entities contacted as part of Ergo's investigation, not simply a list of initial contacts.

~~12.    All documents reflecting the existence of, or establishment of, any attorney-client relationship between Defendant and Uber or any lawyer at Uber with respect to this Lawsuit or work conducted by Ergo relating to Plaintiff or Plaintiff's counsel.~~

~~13.    All documents reflecting the existence of, or establishment of, any attorney-client privilege and/or joint defense privilege between Defendant and Uber or any lawyer at Uber with respect to this Lawsuit or work conducted by Ergo relating to Plaintiff or Plaintiff's counse~~l.

14.     All documents supporting, refuting, or otherwise relating to Defendant's claims, in his letter to Brian Feldman, dated March 29, 2016, that Ergo was retained to investigate Plaintiff "to determine whether this [L]awsuit posed a safety risk for Mr. Kalanick" and that an investigation of Plaintiff "was a prudent and unfortunately necessary step to protect a man who faces real threats to his safety."

15.     Documents sufficient to show Uber's organization and the relative authority and reporting lines between Defendant and lawyers at Uber, including but not limited to Salle Yoo, Esq., Joe Sullivan, Esq., and Craig Clark, Esq.

16.     Documents sufficient to show the states, commonwealths, or districts in which Salle Yoo, Esq., Joe Sullivan, Esq., and Craig Clark, Esq. are licensed, admitted, or otherwise currently permitted to practice law.

17.     Documents sufficient to show all policies and practices at Uber as of December 16, 2015 concerning the circumstances under which Uber itself conducts or retains investigators or other consultants to conduct any kind of investigation or background research of private individuals, including documents sufficient to show all prior instances where Uber has undertaken such efforts.

18.     Any policy manuals, guidelines or internal job descriptions for the positions of: (i) General Counsel, (ii) Chief Security Officer and (iii) Legal Director, Security and Enforcement positions.

19.     All minutes, attendance lists, and materials distributed at meetings of Uber's Board of Directors that took place from December 16, 2015 to present in which anything concerning or relating to Ergo, the Lawsuit, or Plaintiff or Plaintiff's Counsel were discussed.

## Certificate of Service

I hereby certify that the foregoing document was served via email upon the following on

May 24, 2016:

        Cynthia Richman, Daniel Swanson, Reed Brodsky
        Gibson Dunn & Crutcher LLP
        *Counsel for Uber Technologies, Inc.*

        Peter Skinner, Alanna Rutherford
        Boies, Schiller & Flexner LLP
        *Counsel for Defendant Travis Kalanick*

Dated: Rochester, New York
     May 23, 2016

                                       JEFF MADSWORTH
                                       *Counsel for Plaintiff*

*Original*

AO 88B (Rev. 12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the

Southern District of New York

| | |
|---|---|
| SPENCER MEYER | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. 15-cv-9796 (JSR) |
| TRAVIS KALANICK | ) |
| | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:
Global Precision Research, LLC, D/B/A Ergo
122 East 55th Street, New York, New York 10022

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: SEE ATTACHED RIDER

| Place: 47th Floor, One Bryant Park, New York, NY 10036 | Date and Time: |
|---|---|
| | 05/27/2016 12:00 pm |

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached -- Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 05/24/2016

| *CLERK OF COURT* | |
|---|---|
| | OR |
| Signature of Clerk or Deputy Clerk | Attorney's signature |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* **PLAINTIFF**
SPENCER MEYER , who issues or requests this subpoena, are:

Jeff Wadsworth, Harter Secrest & Emery LLP, Rochester, New York 14604, jwadsworth@hselaw.com, 585-231-1200

### Notice to the person who issues or requests this subpoena
A notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B (Rev. 12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.  15-cv-9796 (JSR)

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)*

on *(date)*                       .

☐  I served the subpoena by delivering a copy to the named person as follows:

on *(date)*                       ; or

☐  I returned the subpoena unexecuted because:

.

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$                       .

My fees are $                       for travel and $                       for services, for a total of $         0.00         .

I declare under penalty of perjury that this information is true.

Date:

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) For a Trial, Hearing, or Deposition.** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
 **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
 **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
  **(i)** is a party or a party's officer; or
  **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2) For Other Discovery.** A subpoena may command:
 **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
 **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) Avoiding Undue Burden or Expense; Sanctions.** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) Command to Produce Materials or Permit Inspection.**
 **(A)** Appearance Not Required. A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
 **(B)** Objections. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
  **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
  **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) Quashing or Modifying a Subpoena.**
 **(A)** When Required. On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
  **(i)** fails to allow a reasonable time to comply;
  **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
  **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
  **(iv)** subjects a person to undue burden.
 **(B)** When Permitted. To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
  **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

  **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
 **(C)** Specifying Conditions as an Alternative. In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
  **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
  **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) Producing Documents or Electronically Stored Information.** These procedures apply to producing documents or electronically stored information:
 **(A)** Documents. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
 **(B)** Form for Producing Electronically Stored Information Not Specified. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
 **(C)** Electronically Stored Information Produced in Only One Form. The person responding need not produce the same electronically stored information in more than one form.
 **(D)** Inaccessible Electronically Stored Information. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) Claiming Privilege or Protection.**
 **(A)** Information Withheld. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
  **(i)** expressly make the claim; and
  **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
 **(B)** Information Produced. If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SPENCER MEYER, individually and on behalf of those similarly situated, | 1:15 Civ. 9796 (JSR) |
| Plaintiffs, | |
| vs. | |
| TRAVIS KALANICK, | |
| Defendant | |

### RIDER TO SUBPOENA DUCES TECUM TO GLOBAL PRECISION RESEARCH LLC, D/B/A ERGO, DATED MAY 24, 2016

Pursuant to Federal Rule of Civil Procedure 45, Plaintiff causes the attached subpoena to be served on Global Precision Research, LLC, D/B/A Ergo ("Ergo") commanding the production of all of the documents and other tangible things specified in the subpoena that are in Ergo's possession, custody, or control. All documents and tangible things responsive to the attached subpoena should be produced for inspection and/or copying by **Friday, May 27, 2016** to the law offices of McKool Smith, 47th Floor, One Bryant Park, New York, NY 10036, or as otherwise agreed to by the parties.

### INSTRUCTIONS

1.      The request shall be construed to include any additional documents responsive to these requests that are discovered or produced after the date of production, and therefore require further and supplemental responses.

2. The request extends to any and all documents in your possession, custody, or control regardless of the physical location of the documents, or whether such documents are possessed by You, Your Employees, attorneys, agents, representatives, or investigators.

3. All documents should be produced as they are kept in the usual course of business or shall be organized and labeled to correspond to the categories in the request. All documents should be produced in the order in which they appear in the files of the custodian, and should contain a clear indication of where each document ends and the next begins. Documents maintained in a file folder or binder should be preceded by the file folder or binder label, if one exists, and should contain a clear indication of where the file folder or binder begins and ends. All attachments to a document should be produced with the document. A unique control number should be affixed to each page (or, to each document, where a native file is produced). Computer files and other documents maintained in electronic form should be produced in machine readable electronic form. The source and location of each responsive document should be designated, including the entity or person from which or whom it was obtained.

4. Your search for Documents should include a search for all types of mobile messaging, on the mobile devices (smartphones or tablets or similar devices) that were and are used by Miguel Santos-Neves or any person working for or with Mr. Santos-Neves in connection with the subject matter set forth in this subpoena.

5. If you object to any of the categories of documents set forth below, you must fully set forth your objections in writing. If objection is made to part of any document or category, the part should be specified. If you object to any request or part of any request, you must produce all documents to which your objection does not apply.

2

6.     If you assert that documents responsive to this subpoena are not discoverable based upon some privilege, provide a written log that identifies: (i) the nature of the privilege (including work product) which is being claimed and, if the privilege is governed by state law, indicate the state's privilege rule being invoked; (ii) the type of document, e.g., letter or memorandum that is being withheld; (iii) the general subject matter of the document; (iv) the date of the document; and (v) the author of the document, the addressees of the document, and any other recipients, and, where not apparent, the relationship of the author, addressees, and recipients to each other.

7.     If any document that you are requested to produce or identify herein was at one time in existence, but has been lost, discarded, or destroyed, identify in writing each document and provide the following information: (a) the date or approximate date it was lost, discarded, or destroyed; (b) the circumstances and manner in which it was lost, discarded, or destroyed; (c) the reason or reasons for disposing of the document (if discarded or destroyed); (d) the identity of all persons authorizing the document and/or having knowledge of the document; (e) the identity of the person(s) who lost, discarded, or destroyed the document; (f) the identity of any persons having knowledge of the contents thereof; and (g) a detailed summary of the nature and contents of the document, including the author(s) of the document(s), the name of the person(s) to whom the document(s) was (were) delivered or addressed, including indicated or blind copy recipients, the date of the document(s), and a description of the subject matter thereof, including any attachment or appendices, and the number of pages.

8.     If any documents cannot be produced in full, you are requested to produce them to the fullest extent possible, specifying the reasons for your inability to produce the remainder and stating any information, knowledge, or belief you have concerning the unproduced portion.

3

9.     In the event that multiple copies of a document exist, produce every copy on which appear any notations or markings of any sort that do not appear on any other copy.

## DEFINITIONS

1.     "Plaintiff" refers to Spencer Meyer, the Plaintiff in this action.

2.     "Defendant" refers to Travis Kalanick, the Defendant in this action, and anyone acting on Defendant's behalf, including but not limited to Boies Schiller & Flexner LLP.

3.     "Ergo," "You," and "Your," means and includes Global Precision Research, LLC, doing business as Ergo, and each person or entity acting on its behalf, including but not limited to its parent and subsidiary companies, predecessors-in-interest, successors-in-interest, affiliated entities, officers, directors, partners, associates, shareholders, agents, employees, servants, representatives, accountants, investigators and attorneys.

4.     "Uber," means and includes Uber Technologies, Inc. and each person or entity acting on its behalf, including but not limited to its parent and subsidiary companies, predecessors-in-interest, successors-in-interest, affiliated entities, officers, directors, partners, associates, shareholders, agents, employees, servants, representatives, accountants, investigators, attorneys (including but not limited to Gibson Dunn), and Defendant.

5.     "Lawsuit" refers to Spencer Meyer v. Travis Kalanick, CIVIL ACTION NO. 1:15 CIV. 9796 (JSR).

6.     "Document" is defined to be synonymous in meaning and equal in scope to the usage of the term "documents or electronically stored information" in Fed. R. Civ. P. 34(a)(1)(A) and shall include all types of instant messaging, or mobile messaging (including, e.g., imessages, text messages and their equivalents). A draft or non-identical copy is a separate document within the meaning of this term.

4

7.     "Documents sufficient to identify" and "documents sufficient to show" mean documents that are necessary and sufficient to provide the information requested. Where "documents sufficient to identify" and "documents sufficient to show" are requested, Uber may submit either responsive documents or an affidavit executed by Uber that contains the requested information, identifies the specific source of the information, and which indicates that the statement is based on information contained in documents or records maintained in the ordinary course of business.

8.     "All" and "Any" shall be construed as encompassing any and all.

9.     The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the document request all responses that might otherwise be outside its scope.

10.     "Include" or "including" denotes a portion of a larger whole and is used without limitation.

11.     "Concerning" means relating to, referring to, describing, evidencing or constituting.

## DOCUMENTS REQUESTED

1.     All documents reflecting agreements with Uber or Defendant concerning or relating to any kind of investigation or background research concerning or relating to Plaintiff, Plaintiff's counsel, or this Lawsuit.

2.     All documents reflecting agreements with Uber or Defendant concerning or relating to any kind of investigation or background research concerning or relating to any other party in any other litigation against Uber or Defendant.

~~3.    All invoices and payment records relating to the retention by Uber or Defendant relating to any kind of investigation or background research concerning or relating to Plaintiff, Plaintiff's counsel, or this Lawsuit.~~

4.    All documents reflecting any instructions, guidance, recommendations, suggestions, demands, or requests from Uber or Defendant relating to any investigation or background research concerning or relating to Plaintiff, Plaintiff's counsel~~, or this Lawsuit~~.

5.    All documents reflecting any understanding by Ergo or by any individual at Ergo concerning or relating to whether Ergo could or should use deception, including but not limited to false statements of purpose or identity, to conduct any investigation or background research concerning or relating to Plaintiff, Plaintiff's counsel~~, or this Lawsuit, or any other party, witness, or lawyer in any other proceeding~~.

6.    All documents concerning or relating to any kind of investigation or background research concerning or relating to Plaintiff, Plaintiff's counsel~~, or this Lawsuit~~, including but not limited to:

      a.   Any reports, summaries, or notes created in connection with any kind of investigation or background research concerning or relating to Plaintiff, Plaintiff's counsel~~, or this Lawsuit~~.

      b.   Any audio recordings, video recordings, or photographs obtained or created in connection with any kind of investigation or background research concerning or relating to Plaintiff, Plaintiff's counsel~~, or this Lawsuit~~.

      c.   All records compiled as part of any investigation or background research concerning or relating to Plaintiff, Plaintiff's counsel~~, or this Lawsuit~~.

d. All records reflecting any communications with any individuals or entities, including but not limited to persons believed to know Plaintiff or Plaintiff's counsel.

e. All internal communications at Ergo concerning or relating to any kind of investigation or background research concerning or relating to Plaintiff, Plaintiff's counsel, ~~or this Lawsuit~~.

f. ~~All communications with Uber or any of its parent and subsidiary companies, predecessors-in-interest, successors-in-interest, affiliated entities, officers, directors, partners, associates, shareholders, agents, employees, servants, representatives, accountants, investigators, attorney, including but not limited to Gibson Dunn, concerning or relating to any kind of investigation or background research concerning or relating to Plaintiff, Plaintiff's counsel, or this Lawsuit~~.

g. All communications with Defendant or Defendant's counsel concerning or relating to any kind of investigation or background research concerning or relating to Plaintiff, Plaintiff's counsel, ~~or this Lawsuit~~.

h. All communications with any other person or entity concerning or relating to any kind of investigation or background research concerning or relating to Plaintiff, Plaintiff's counsel, ~~or this Lawsuit.~~

7. All documents reflecting or revealing the investigative tools or approaches (*e.g.*, spyware, vehicle surveillance, phone calls or emails to friends or family) employed to obtain information relating to (a) Plaintiff, Plaintiff's counsel, ~~or this Lawsuit; (b) any engagement by Uber or Defendant~~.

7

8. All documents reflecting the awareness, or potential awareness, of Uber or Defendant regarding the use of the following investigative tools or approaches in any investigation or background research by, or associated with, Ergo:

    a. Cold calls (*i.e.*, telephone calls to individuals without prior communication);

    b. Deception;

    c. False statements or cover stories regarding purpose;

    d. False statements or cover stories regarding identity;

    e. Research or investigation of a subject's lawyers (*e.g.*, investigation or background research regarding a party's counsel).

9. Documents sufficient to show the roles and responsibilities of Miguel Santos-Neves.

10. A curriculum vitae or resume of Miguel Santos-Neves.

11. Documents sufficient to identify all individuals, whether employed at Ergo or otherwise, involved in any investigation or background research into Plaintiff, Plaintiff's counsel, or this Lawsuit.

12. All documents reflecting the date, time, or manner of any communications between Ergo and Uber (including Defendant) relating to the Lawsuit, Plaintiff, or Plaintiff's counsel, including but not limited to the following: phone logs, phone bills, text messages, emails, notes, and invoices issued from Ergo to Uber or Defendant.

13. All documents reflecting communications with Defendant or Defendant's counsel, whether direct or indirect (*e.g.*, communications with Uber intended or known to be delivered to Defendant or Defendant's counsel), between December 16, 2016, and the date of this subpoena.

# EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IMPOSSIBLE FOODS INC., | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 22-311 (WCB) |
| | ) | |
| v. | ) | **FILED UNDER SEAL** |
| | ) | |
| MOTIF FOODWORKS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**[PROPOSED] ORDER REGARDING THE USE OF
INVESTIGATIVE FIRMS BY IMPOSSIBLE AND ITS COUNSEL**

WHEREAS, Plaintiff Impossible Foods Inc. ("Impossible") and its counsel have engaged investigative firms in an improper effort to obtain information and product samples from Defendant Motif FoodWorks, Inc. ("Motif") during the course of this litigation;

IT IS HEREBY ORDERED that:

1.      Impossible, its counsel, and its agents are enjoined from undertaking, directly or indirectly, any further undisclosed investigations of Motif or its employees outside of the normal discovery process of this litigation or through the use of false pretenses, private investigators, or other unlawful, fraudulent, or unethical means.

2.      Impossible is enjoined from using in any manner in connection with this case any of the information or product samples obtained by investigative firms engaged by Impossible or its counsel, including by presenting arguments or seeking discovery concerning the same.

3.      Within two weeks of this Order, Impossible and its counsel shall produce to Motif any documents or information falling into the following categories:

a.      Documents and communications exchanged between T&M USA and Integrity 1 Solutions (or any other investigative firms) regarding efforts to contact Motif

or its employees, including but not limited to any instructions, efforts, results or summaries of the investigations;

b.      Documents and communications exchanged between Impossible or its counsel, on the one hand, and T&M USA or Integrity 1 Solutions (or any other investigative firms), on the other hand, regarding efforts to contact Motif or its employees outside of this litigation, including but not limited to any instructions, efforts, results or summaries of the investigations;

c.      Documents and communications created by or exchanged between Impossible and its counsel regarding efforts to contact Motif outside of this litigation, including but not limited to any instructions, efforts, results or summaries of the investigations.

4.      Within two weeks of this Order, Impossible and/or its counsel shall produce to Motif a declaration describing all outreach by Impossible and Impossible's agents (including its counsel) relating to efforts to contact Motif or Motif's employees outside of the formal discovery process in this litigation, including but not limited to identifying the dates of any outreach, the people involved (on both sides), representations made to Motif or Motif's employees during the outreach, information learned as a result of the outreach, and identification of any samples of Motif's product obtained.

5.      Within two weeks of production of the materials described in Paragraphs 3-4 of this Order, the parties are ordered to meet and confer regarding any other relief that may be necessitated—including but not limited to further discovery and/or sanctions—and may submit a joint stipulation for the Court's consideration regarding such relief.  If the parties are unable to reach agreement on the form of relief, the parties may request further briefing with the Court.

SO ORDERED this _____ day of _____, 2023.

_____
United States District Judge